No. 2014-1538

# 𝔘nited 𝔖tates 𝔠ourt of 𝔄ppeals
### *for the*
# 𝔉ederal 𝔠ircuit

———————

PROGRESSIVE CASUALTY INSURANCE CO.,

*Appellant*,

v.

LIBERTY MUTUAL INSURANCE CO.,

*Appellee*.

———————

Appeal from United States Patent and Trademark Office,
Patent Trial and Appeal Board, in Case CBM2012-00010
(Judge Jameson Lee, Judge Joni Y. Chang, Judge Michael R. Zecher).

## BRIEF OF APPELLANT, PROGRESSIVE CASUALTY INSURANCE CO.

James R. Sobieraj
Cynthia A. Homan
James A. Collins
Laura A. Lydigsen
Nicholas A. Restauri
BRINKS GILSON & LIONE
455 N. Cityfront Plaza Drive
NBC Tower – Suite 3600
Chicago, Illinois 60611
(312) 321-4200

*Attorneys for Appellant,*
September 25, 2014          *Progressive Casualty Insurance Co.*

## United States Court of Appeals for the Federal Circuit

2014-1538

PROGRESSIVE CASUALTY INSURANCE v. LIBERTY MUTUAL INSURANCE CO.

## CERTIFICATE OF INTEREST

Counsel for Appellant certifies the following:

1.  The full name of every party or amicus represented by me is:

    Progressive Casualty Insurance Co.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    Not applicable.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    The Progressive Corporation
    Drive Insurance Holdings, Inc.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by this firm in the trial court or agency or are expected to appear in this court are:

    James R. Sobieraj
    Cynthia A. Homan
    James A. Collins
    Robert S. Mallin
    Laura A. Lydigsen
    Nicholas A. Restauri
    Joseph S. Hanasz (formerly of Brinks Gilson & Lione)
    BRINKS GILSON & LIONE
    455 N. Cityfront Plaza Drive
    NBC Tower – Suite 3600
    Chicago, Illinois 60611

September 25, 2014                    /s/ *James R. Sobieraj*
                                      James R. Sobieraj

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................iv

TABLE OF ABBREVIATIONS .......................................................... vii

STATEMENT OF RELATED CASES ............................................... viii

I.    STATEMENT OF JURISDICTION ............................................1

II.   STATEMENT OF THE ISSUES ................................................1

III.  STATEMENT OF THE CASE SETTING OUT THE FACTS
      RELEVANT TO THE ISSUES...................................................2

      A.    Introduction ........................................................................2

      B.    The Parties..........................................................................3

      C.    In July 1998, Insurance Companies Interacted With
            Customers In Traditional Ways, And The Internet Was Far
            Less Sophisticated Than It Is Today ....................................4

      D.    The '088 Patent Claimed A New And Important Invention
            For The Insurance Industry .................................................9

            1.    Independent Claim 1:  The "Real-Time" Insurance
                  Policy Adjustment Module Limitation .......................9

            2.    Dependent Claims 9-11, 42, And 43.........................12

            3.    The '088 Patent Withstood Rigorous Examination And
                  A Reexamination Filed By Liberty...........................13

      E.    Liberty Launched A Second Attack On The '088 Patent In
            The CBMPR Proceeding.....................................................15

            1.    Liberty's Petition Barely Mentioned Obviousness
                  Based On The NAIC Paper And Rested Largely On
                  Unreliable And Unhelpful Testimony From A
                  Professional "Expert"...............................................16

            2.    The Board Instituted Trial Despite The Petition's
                  Deficiencies...............................................................18

            3.    Progressive Responded With A Detailed Showing That
                  The NAIC Paper Alone, And Together With
                  Lockwood, Did Not Teach Or Suggest The Claimed
                  Inventions.................................................................19

4.    Liberty Offered, And The Board Improperly Allowed, New Evidence That Did Not Cure the Petition's Deficiencies..................................................22

5.    The Board's Final Written Decision ..........................23

IV.    SUMMARY OF THE ARGUMENT .................................................23

V.    ARGUMENT.........................................................................................26

A.    Standard of Review ...............................................................26

B.    The Board Legally Erred In Construing "Real-Time" Contrary To The Intrinsic Evidence And The Understanding Of A Skilled Artisan.......................................................................27

C.    The Board Legally Erred In Its Obviousness Determination For Claims 1-8, 12-41, And 44-46 .......................................31

1.    Substantial Evidence Does Not Support The Board's Obviousness Findings ................................................31

a.    The NAIC Paper Was A Regulatory Document That Suggested Desirable Results, But Failed To Disclose Or Suggest How To Achieve Them ................33

b.    The Passages Of The NAIC Paper Relied On By The Board Did Not Teach Or Suggest The Claimed Invention ............................................36

c.    Progressive Showed That The NAIC Paper As A Whole Failed To Teach Or Suggest "Real-Time" Policy Adjustments..............................................47

2.    The Board Did Not Conduct A Proper Obviousness Inquiry ......................................................................49

D.    The Board Also Legally Erred In Its Obviousness Determination For Claims 4-11, 42, And 43......................52

1.    The Board Erroneously Placed The Initial Burden On Progressive To Prove Non-Obviousness .................52

2.    The Non-Obviousness Of Claims 9-11 ....................53

3.    The Non-Obviousness Of Claim 42.........................56

4.    The Non-Obviousness Of Claim 43.........................58

VI.    CONCLUSION AND RELIEF REQUESTED..............................58

# TABLE OF AUTHORITIES

## CASES

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
 694 F.3d 1312 (Fed. Cir. 2012) ............................................................51

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
 334 F.3d 1294 (Fed. Cir. 2003) ............................................................28

*In re Baker Hughes Inc.*,
 215 F.3d 1297 (Fed. Cir. 2000). ...........................................................32

*In re Deters*,
 515 F.2d 1152 (CCPA 1975) ................................................................55

*In re Giannelli*,
 739 F.3d 1375 (Fed. Cir. 2014) ..................................................... 27, 49

*In re Glatt Air Techniques, Inc.*,
 630 F.3d 1026 (Fed. Cir. 2011) ............................................................32

*In re NTP, Inc.*,
 654 F.3d 1279 (Fed. Cir. 2011). ................................... 27, 31, 41, 51

*In re O'Farrell*,
 853 F.2d 894 (Fed. Cir. 1988) .............................................................36

*In re Sang-Su Lee*,
 277 F.3d 1338 (Fed. Cir. 2002) ...........................................................49

*In re Translogic Tech. Inc.*,
  504 F.3d 1249 (Fed. Cir. 2007). ..........................................................31

*In re Zurko*,
 258 F.3d 1379 (Fed. Cir. 2001) ...........................................................49

*Innogenetics N.V. v. Abbott*,
 512 F.3d 1363 (Fed. Cir. 2008) ..................................................... 45, 51

*InTouch Techs., Inc. v. VGo Commc'ns, Inc.*,
 751 F.3d 1327 (Fed. Cir. 2014) ...........................................................33

*KSR Int'l Co. v. Teleflex Co.*,
 550 U.S. 398 (2007) ..................................................................31, 32, 49

*Leo Pharm. Prods., Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ...................................................... 26, 27

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................... 28

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
    566 F.3d 989 (Fed. Cir. 2009) ............................................................ 36

*Rambus Inc. v. Rea*,
    731 F.3d 1248 (Fed. Cir. 2013) .............................................. 46, 53, 55

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
    655 F.3d 1364 (Fed. Cir. 2011) ....................................... 33, 35, 36, 42

*Unigene Labs., Inc. v. Apotex, Inc.*,
    655 F.3d 1352 (Fed. Cir. 2011) ......................................................... 42

*Upjohn Co. v. MOVA Pharm. Corp.*,
    225 F.3d 1306 (Fed. Cir. 2000) ......................................................... 50

STATUTES

28 U.S.C. § 1295(a)(4)(A) ....................................................................... 1

35 U.S.C. § 103(a) ..................................................... 2, 23, 31, 35, 58

35 U.S.C. § 142 ......................................................................................... 1

35 U.S.C. § 329 ......................................................................................... 1

35 U.S.C. § 6 ............................................................................................. 1

REGULATIONS

37 C.F.R. § 42.300(b) ............................................................................. 30

OTHER AUTHORITIES

*General Administrative Trial Final Rules*,
    77 Fed. Reg. 48612 (Aug. 14, 2012) ................................................ 26

John Stephens, What to Expect from Growing AIA Patent
    Challenges (June 30, 2014), *available at*
    http://www.law360.com/articles/551462/what-to-expect-from-
    growing-aia-patent-challenges. ......................................................... 26

Patent Trial and Appeal Board, AIA Progressive (Sept. 11, 2014),
    *available at*
    http://www.uspto.gov/ip/boards/bpai/stats/aia_statistics_091114.p
    df......................................................................................................................26

# TABLE OF ABBREVIATIONS

### *Parties*

| | |
|---|---|
| Progressive | Progressive Casualty Insurance Company (Appellant) |
| Liberty | Liberty Mutual Insurance Company (Appellee) |

### *Patents & Printed Publications*

| | |
|---|---|
| the '088 patent | U.S. Patent No. 7,124,088 (A5067-81) |
| the '269 patent | U.S. Patent No. 7,877,269 |
| the NAIC paper | *The Marketing of Insurance Over the Internet*, National Association of Insurance Commissioners, 1998 (A5082-146) |
| Lockwood | U.S. Patent No. 4,567,359 (A5147-60) |

### *Defined Terms*

| | |
|---|---|
| ACORD | Association for Cooperative Operations Research and Development |
| AIA | The Leahy–Smith America Invents Act |
| Board | Patent Trial and Appeal Board |
| CBMPR | Covered Business Method Patent Review |
| CRU | Central Reexamination Unit of the Patent Office |
| IEEE | Institute of Electrical and Electronics Engineers |
| NAIC | National Association of Insurance Commissioners |
| Patent Office | United States Patent and Trademark Office |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant states as follows:

(a) No other appeal in or from the proceeding below was previously before this or any other appellate court.

(b) This appeal may affect or be affected by *Progressive Casualty Insurance Co. v. Liberty Mutual Insurance Co.*, 2014-1549, pending in this Court.  On July 17, 2014, the Court ordered that the present appeal and 2014-1549 "shall be considered companion cases and assigned to the same merits panel for oral argument."  Dkt. 22.  Also, the patent at issue here has been asserted in two pending district court proceedings, both of which presently are stayed: *Progressive Cas. Ins. Co. v. Allstate Ins. Co. et al.*, No. 1:11-cv-82 (N.D. Ohio); *Progressive Cas. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, No. 1:12-cv-1068 (N.D. Ohio).

## I.    STATEMENT OF JURISDICTION

The Board had jurisdiction over Liberty's Petition under 35 U.S.C. § 6 and Section 18 of the AIA.  The Board's Final Written Decision was entered on February 24, 2014.  A5000-45.  Progressive timely appealed on April 21, 2014.  Dkt. 1 at 3-7; 35 U.S.C. § 142.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 329.  The decision appealed from is final.

## II.    STATEMENT OF THE ISSUES

1.    Whether the Board legally erred in construing the claim term "real-time" by adopting verbatim a dictionary definition that included the vague term "external process," which the Board refused to construe as the intrinsic evidence required.

2.    Whether the Board legally erred by concluding, without the substantial evidence or detailed analysis required to support that conclusion, that claims 1-8, 12-41, and 44-46 of the '088 patent would have been obvious based on the NAIC paper alone, even though the NAIC paper, considered as a whole: (a) was commissioned to address regulatory concerns in the insurance industry; (b) couched as aspirational and speculative comments about possible future use of the Internet by the insurance industry; and (c) did not teach or suggest the claimed on-line insurance policy service system for making "real-time" insurance policy adjustments in response to data received from policyholders.

1

3.    Whether the Board legally erred by concluding that dependent claims 4-11, 42, and 43 of the '088 patent would have been obvious based on the combination of the NAIC paper and Lockwood, given: (a) the Board's erroneous findings and conclusion concerning the NAIC paper; (b) the Board's legally improper presumption that Lockwood taught or suggested claimed features unless and until the patent owner – Progressive – showed these features were "preclude[d]" by Lockwood, rather than requiring the petitioner – Liberty – to make the required prima facie case; and (c) the Board's erroneous findings that Lockwood disclosed the added features of the dependent claims.

## III.    STATEMENT OF THE CASE SETTING OUT THE FACTS RELEVANT TO THE ISSUES

### A.    Introduction

In the CBMPR proceeding on appeal, the Board seemed predisposed to invalidate the '088 patent, which already had endured a rigorous examination and reexamination in the Patent Office.  Missteps taken by the Board included:

- Instituting CBMPR based on a Petition that included but a single, conclusory sentence alleging that the NAIC paper rendered claims obvious under 35 U.S.C. § 103(a);

- Erroneously construing the claim term "real-time" by adopting verbatim a generic, technical dictionary definition that included the vague term – "external process" – and by spurning intrinsic evidence

2

that compelled a different claim construction;

- Overstating the importance of the nature and content of the NAIC paper, which offered aspirational statements about possible future Internet usage by the insurance industry and did not teach or suggest the claimed invention;

- Disregarding the testimony of Ruth Ann Cacchione, a contributor to the NAIC paper and highly experienced in the insurance industry, and uncritically accepting the conclusory, unsubstantiated statements of David Klausner, a professional "expert" without insurance expertise, who merely used the meaning of "real-time" that counsel "instructed" him to use; and

- Overlooking important differences between purchasing *new* insurance policies online versus the claimed making adjustments to *existing* policies online.

### B.    The Parties

Progressive is based in Mayfield Village, Ohio, and is part of The Progressive Corporation, founded in 1937 and one of the nation's largest auto insurers.  A5247-48; A6907-08.

Progressive has long been recognized as an innovator in the delivery of auto insurance information and customer services via the Internet.  A6907.  Progressive

is known for "pushing the envelope in an industry that has largely been slow to go online." *Id.* At the time of the invention in 1998, Progressive received the "Best of Insurance" award from Financial NetNews. *Id.*

Liberty, based in Boston, MA, sells motor vehicle insurance in competition with Progressive. A5247-48.

### C. In July 1998, Insurance Companies Interacted With Customers In Traditional Ways, And The Internet Was Far Less Sophisticated Than It Is Today

At the time of Progressive's invention in July 1998,[1] insurance companies collected information from customers the traditional way. The insurance buyer and a personal representative of the insurer engaged in a lengthy application process that took days to complete. A5074, col. 1, ll. 21-26; A7217-29, ¶¶ 26-31.

When an existing insurance policy is modified during the term of the policy, it is called a policy endorsement. A7227, ¶ 26. For existing insurance customers, changes in policy parameters, such as changes in residence, vehicle locations, number of household drivers, or acquisition of new or replacement of old vehicles covered by the policy, required regular communication between the customer and the insurer or its agents. A5074, col. 1, ll. 31-36. To endorse a policy prior to July

---

[1] In the CBMPR proceeding, Liberty relied on July 30, 1998, one year prior to the '088 patent's filing date, as the priority date for the '088 patent. *See, e.g.*, A6528-33, ¶¶ 9, 13-14, 18-19, 22; A6663-65, ¶¶ 15, 20, 22, 22 n.1, 30 n.2.

4

1998, the policyholder would communicate with the insurer's agent or service representative in writing, telephonically, or personally, all time-consuming and costly methods prone to servicing problems. A5074, col. 1, ll. 36-41; A7228-29, ¶¶ 27, 31.

In a typical encounter with an existing customer in those days, the agent or service representative would enter the information collected from the customer into a standard policy change request form, such as those provided by ACORD. A7228, ¶ 28. The agent or representative then would send the information or completed ACORD form to the insurer, which would process forms in batches overnight. *Id.* ¶¶ 28-29. The next day, the results would be printed and returned to the agent or representative to be checked for accuracy. *Id.* ¶ 29. Sometime thereafter, the agent or representative would mail the completed endorsement to the policyholder. A7229, ¶ 30. The entire process typically involved multiple people, at multiple locations, and took several days to complete. A7227-29, ¶¶ 26-31.

In the late 1990s, the vast majority of insurance companies only were beginning to market insurance online by providing "static insurer sites." A5108. Even when a consumer used "on-line forms . . . to submit basic information" to an insurance producer, i.e., agent, if an insurance product were eventually located, underwriting proceeded "via traditional channels." *See* A5108-09. There were

5

good reasons why insurance companies still were collecting information from customers the traditional way in 1998.  The NAIC paper,[2] which focused on regulatory and legal issues of concern to the insurance industry, but which also commented about the challenges that lay ahead if Internet technology was some day to be adopted for the sale and service of insurance, recognized that:

> Current electronic commerce typically involves the sale of goods as opposed to services, such as insurance.  This disparity in growth can be tied to a variety of issues, including consumer acceptance, security and regulatory concerns surrounding insurance sales on the Internet. Unlike the sale of a book or article of clothing, the sale of an insurance policy involves complicated contractual language and the transmission of what may be confidential information.

A5095.

In evaluating the prior art and the issue of obviousness *at the time of the invention* of the '088 patent, it is important to bear in mind that the Internet in 1998 was not as advanced and ubiquitous as it is today.  A5094.  The NAIC paper reflects how different the Internet was in 1998 compared to today.  *See, e.g.*, A5094 ("for individual consumers access [to the Internet] typically is achieved through ordinary telephone lines and modems"); *id.* ("The Internet is relatively new . . . ."); A5112 ("electronic signatures are a relatively new concept"); A5114

---

[2] In line with the matters addressed in the NAIC paper, the NAIC is a trade association of state insurance regulators and provides regulatory support to the industry, including data collection, and development of model laws, regulations, and policy positions.  A7230-31, ¶¶ 33-35.

("a general lack of insurance industry and consumer confidence in the overall security of Internet transactions exists").

Within that context, the NAIC paper highlighted the nascent state of Internet-based communications between insurers and their customers and the industry's aspirations in that regard. A5096; A7182-83, ¶ 29. According to the NAIC paper, the state of the art was informational, with many web sites simply offering general insurance information and only some just becoming interactive. A5096; A7182-83, ¶¶ 28-29; A5097. In speculating about the future, the NAIC paper envisioned an as-yet-undeveloped technology that would allow web sites to realize "the ability to conduct instant transactions and communications." A5096; A7183, ¶ 29.

According to the NAIC paper, policy change notices and loss notices at insurers' web sites also were in their "infancy" in 1998. A5107-08; A7183, ¶ 30. Thus, the paper explained that ACORD only had begun to make its insurance forms available earlier that year, and the paper speculated that web sites would develop policy change notices that *soon* would allow insurance policyholders to instantaneously advise their insurance companies of desired changes. A5107-08; A7183-84, ¶ 30. The NAIC paper additionally made it clear that processing usually would proceed via traditional channels, suggesting that conventional practices would continue to be followed. A5108-09; A7183-84, ¶ 30;

7

A7227-33, ¶¶ 26-31, 40.  In fact, the NAIC paper did not disclose any methods of underwriting other than processing via "traditional channels."  *Id.*

As noted in the NAIC paper, there were nearly 1000 insurers, A5107, but the paper does not cite an example of a single insurer operating a web site that adjusted an insurance policy parameter in "real-time" in response to data received from the policyholder.  The California Department of Insurance's web site was discussed in the paper as exemplary of the state of the art.  *See* A5109.  Yet, in that web site, "[n]o interactivity beyond sending electronic mail to the site administrator is currently available," and the "site is similar in design to many other current state insurance regulatory agency sites."  *Id.*

Cacchione, then known as Ruth Ann Eckert, was one of a group of insurance professionals who served as contributors to the NAIC paper, and was commended for her "outstanding contributions" to the project.  A5089; A7230-31, ¶¶ 33-36.  She explained to the Board why the NAIC paper did not teach or suggest an operation that would adjust an insurance policy parameter in "real-time" in response to data received from the policyholder.  A7231-41, ¶¶ 38-57.  Cacchione's testimony is consistent with the NAIC paper, which disclosed that, in 1998, web sites *would* – in time – integrate with agency systems that *could eventually* allow policyholders to make changes to their policies.  A5105; A7237-40, ¶¶ 49-56; A7184-85, ¶ 31.

8

**D.    The '088 Patent Claimed A New And Important Invention
For The Insurance Industry**

**1.    Independent Claim 1:  The "Real-Time" Insurance
Policy Adjustment Module Limitation**

The '088 patent inventors recognized that if personal involvement between the insurer, the agent, representative, and the existing customer could be minimized, costs would be reduced and efficiency would improve.  A5074, col. 1, ll. 41-45.  Their invention accomplished this goal.

The '088 patent claims an Internet on-line insurance policy service system that facilitates "real-time" automated communication of policy information, adjustment of policy parameters, calculation and communication of resulting policy quotes, and implementation of policy changes, while reducing or eliminating insurer involvement in and supervision of the communication.  A5074, col. 1, ll. 6-14; col. 1, ll. 65 – col. 2, l. 2.

Claim 1 is the only independent claim in the '088 patent and recites an on-line insurance policy service system comprising several parts and modules:

1.  An on-line insurance policy service system comprising:

a web browser for accessing remote insurance information by an insurance policyholder and software linked to the remote insurance information;

a publicly accessible distributed network for transferring data from the web browser;

an information module, remote from the web browser coupled to the publicly accessible distributed network, that *identifies the insurance policyholder and verifies an insurance policy parameter*

9

of an existing insurance policy of the insurance policyholder *in real-time in response to first data received from the insurance policyholder* through the publicly accessible distributed network and the web browser;

where the first data comprises a personal security code that allows access to insurance policy parameters of the insurance policyholder;

an insurance policy adjustment module, remote from the web browser coupled to the publicly accessible distributed network, that *adjusts the insurance policyholder's insurance policy parameter in real-time in response to second data received from the insurance policyholder* through the publicly accessible distributed network and the web browser,

where the *second data comprises a selection of the insurance policy parameter*;

where the insurance policy adjustment module provides an acknowledgement to the web browser in response to the adjustment of the selected insurance policy parameter within the existing insurance policy, and implements the adjustment to the existing insurance policy; and

where an insurer's computer generates an insurance document customized to the insurance policyholder as identified by the personal security code and sends the customized insurance document to the web browser in response to the second data received from the insurance policyholder through the publicly accessible distributed network and the web browser.

A5078, col. 9, ll. 6-44 (emphases added).

As explained in the '088 patent specification and as illustrated by the screenshots of an embodiment included in the Appendix filed with the '088 patent application, A5790-868, the claimed invention includes a publicly accessible system having a "user-friendly interface [that] guides the customer through various activities . . . without need for personal handling by an individual representative of

10

the insurer or an independent agent." A5074-75, col. 2, l. 65 – col. 3, l. 8. For

example, Progressive's publicly accessible interface allowed policyholders a new,

uncomplicated way to add vehicles to a policy and to customize the policy by

selecting desired coverage levels:



A5831; A8534. While these types of forms may be common on today's Internet,

they were a pioneering breakthrough in the late 1990s. The system thus allowed

policyholders to self-service their existing insurance policies by adjusting policy

parameters and generating customized insurance documents directly via the

Internet, thereby avoiding the time, hassle, and costs associated with

communicating through an insurance agent. According to the claimed invention,

policyholders are identified in "real-time"; policy parameters are verified in "real-

time"; and policy adjustments occur in "real-time." A5078, col. 9, ll. 12-31.

11

### 2.    Dependent Claims 9-11, 42, And 43

Dependent claims 9-11, 42, and 43 address a subset of policy adjustments that results in a price adjustment to a selected insurance policy parameter.  A5078, col. 10, ll. 5-14; A5081, col. 1, l. 21 – col. 2, l. 14.  Progressive's new system communicated the price adjustment to the policyholder *during the user's Internet session*, typically by an acknowledgement provided on its user interface, as exemplified in another screenshot of an embodiment filed with the '088 patent application:



A5821; *see also* A5814-21.

Claim 9 recites that the insurance policy adjustment module provides an

acknowledgement to the policyholder comprising "a price of the adjustment to the selected insurance policy parameter." A5078, col. 10, ll. 5-7. The "selected insurance policy parameter" is the insurance policy parameter of an *existing* insurance policy, as described in claim 1. A5078, col. 9, ll. 12-31 (emphasis added). Claims 10 and 11 depend from claim 9. A5078, col. 10, ll. 8-14.

Claim 42 includes claim 1's insurance policy adjustment module, which is further configured to "generate in real-time an insurance policy *cost adjustment* attributable to the adjustment of the . . . insurance policy parameter" and to "communicate the . . . cost adjustment in real-time . . . to the insurance policyholder over the publicly accessible distributed network." A5081, col. 1, ll. 21-30 (emphasis added).

Similarly, claim 43 requires that the insurance policy adjustment module "generate an insurance policy *cost adjustment* attributable to the adjustment of the insurance deductible or policy limit" and "communicate the . . . cost adjustment to the insurance policyholder over the publicly accessible distributed network in real-time in the customized insurance document." A5081, col. 2, ll. 1-14 (emphasis added).

### 3.    The '088 Patent Withstood Rigorous Examination And A Reexamination Filed By Liberty

The '088 patent claims overcame rigorous examination and reexamination by the Patent Office prior to the CBMPR proceeding. A5314-20; A5872-79. The

'088 patent application was filed on July 30, 1999. A5754-868. During its prosecution, the Examiner issued a series of six Office Actions, primarily objecting to the claims based on several prior art references. A5649-50; A5615-16; A5564-65; A5512-13; A5475-76; A5448-49.

On January 6, 2005, applicants filed a Request for Continued Examination, cancelling all prior claims and adding new claims to clarify certain inventive concepts of their invention. A5394-406. The Patent Office subsequently issued a Notice of Allowance stating that the prior art failed to teach material limitations of the claims, including "permit[ting] *an insurance policyholder* to make adjustments *to their* existing insurance policies *in real-time* through a web browser interface." A5318 (emphases added). On October 17, 2006, the '088 patent issued. A5067.

On January 12, 2011, Progressive sued Liberty for infringement of the '088 patent. A5271-87. Shortly after, Liberty filed an *ex parte* request for reexamination. A6258-59. After initially issuing a prior art rejection, a panel of highly trained and experienced examiners in the CRU confirmed all original claims of the '088 patent as valid without amendment or cancellation. A5872-79. The Certificate of Reexamination was issued on September 4, 2012. A5869-70.

### E.    Liberty Launched A Second Attack On The '088 Patent In The CBMPR Proceeding

Apparently unhappy with the reexamination results, a few weeks after the reexamination certificate was issued, Liberty filed CBMPR Petitions making nearly identical arguments against Progressive's '088 patent and its '269 patent, which also relates to an on-line policy self-servicing system.[3]  The Petition in this appeal involves the '088 patent.  A5161-244.  The companion appeal, 14-1549, involves Liberty's Petition for the '269 patent.[4]

---

[3] Congress did not intend for patents owned by companies such as Progressive to be reviewed in CBMPR proceedings.  Congress created CBMPR proceedings to target non-practicing entities and "patent trolls."  A6913, col 1.  By contrast, "[p]atent holders [such as Progressive] who have generated productive inventions and have provided large numbers of American workers with good jobs through the development and commercialization of those patents are not the ones that have created the business method patent problem," and it was "not the understanding of Congress that such patents would be reviewed and invalidated under Section 18."  A6914, col. 3.  "Section 18 is not intended to allow owners of valid patents to be harassed or subjected to the substantial cost and uncertainty of the untested review process."  *Id.* at col. 1.

[4] The '269 patent is a continuation of the '088 patent.  In the CBMPR proceedings for both patents, the Board invalidated the independent claims, and certain dependent claims, as obvious based on the NAIC paper, and the remaining dependent claims as obvious based on the NAIC paper in view of Lockwood.  The Board's Final Written Decisions in the '088 and '269 proceedings are substantially the same.  Consequently, Progressive's blue briefs in the companion appeals also are substantially the same.

1.      **Liberty's Petition Barely Mentioned Obviousness Based On The NAIC Paper And Rested Largely On Unreliable And Unhelpful Testimony From A Professional "Expert"**

The centerpiece of Liberty's Petition was an ill-conceived § 102(b) anticipation argument based on the NAIC paper.  The Petition included prolix claim charts, which were a thinly veiled attempt to gloss over the NAIC paper's failure to disclose several claim limitations.

Liberty's Petition included a single-sentence, tag-along § 103 obviousness "argument" based on the NAIC paper alone:

> As discussed above, NAIC discloses the limitations of claims 1-3, 12-32, 34-41, and 44-46. However, to the extent these claims present any further limitations, they are also rendered obvious by NAIC, as a POSITA would have found it obvious to include such limitations without need to resort to other references.

A5208-09.  The Petition neither identified the alleged "further limitations" nor explained how a skilled artisan "would have found it obvious to include such limitations without need to resort to other references."  It did not explain how the teachings of the NAIC paper could have been modified to teach the (unidentified) missing claim limitations, nor did it show how a person of ordinary skill in the art at the time of the invention would have made the assumed modifications.  *See* A5208-10.

Liberty included in its Petition declarations from David Klausner and Mary O'Neil.  A6524-662; A6658-784.  Klausner makes his living as a professional

16

testifying "expert."  A6540, A6524-25, ¶ 2.  Though professing to be an expert in the "on-line computer systems aspects pertinent to the '088 patent," (A6529-30, ¶¶ 12-13), Klausner did not offer an opinion on what the claim term "real-time" would have meant to the skilled artisan at the time of the invention.  During his deposition, he admitted that he had not interpreted or formed an opinion about the meaning of the '088 patent claims.  A7121, at 104:12-105:23.  Instead, Klausner simply followed what his counsel apparently "instructed" him about the term's meaning.  A6531, ¶ 16.

Klausner further conceded that "[t]he field of art relevant to the '088 Patent is insurance, and more particularly, processing, rating and adjusting new and existing insurance policies using on-line computer systems."  A6529, ¶ 12.  However, Klausner never consulted anyone with knowledge about the insurance aspects of the claims or the art; he did not even speak with O'Neil.  *See* A7118-20, at 93:25-98:19; A7129, at 136:6-137:5.  Liberty further admitted that Klausner "never puport[ed] to testify as an expert on insurance matters."  A7765, n.3.  Despite having no expertise or insights into the insurance aspects of this art (A7118-20, at 92:20-98:19), which dominated the NAIC paper, Klausner's declaration simply parroted selective portions of the NAIC paper and broadly assumed that any required details missing from the NAIC paper would have been obvious to a person of ordinary skill in the art.  A6534-37, ¶¶ 25-28.

Although the NAIC paper discussed regulatory and other obstacles unique to the insurance industry, A5095, Klausner did not explain how his opinions for comparing insurance to the Internet technologies in use to sell books were supportable, or even relevant. Klausner even relied on Amazon.com to support his assertions as to the known benefits of online transactions, A6533-34, ¶ 24, even though the NAIC paper explicitly recognized the differences between traditional electronic commerce, citing the example of the "sale of a book or article of clothing" versus "sale of an insurance policy [that] involves complicated contractual language and the transmission of what may be confidential information." A5095.

The O'Neil declaration is most notable for what it did *not* say. After also parroting selective portions of the NAIC paper, she opined that a person of ordinary skill in the art would have understood that the NAIC paper disclosed allowing a policyholder to make adjustments to parameters of a policyholder's existing insurance policy. A6669-70, ¶¶ 30-32. What this insurance-industry veteran did *not* say, however, is that a skilled artisan would have understood from the NAIC paper that these types of insurance parameter adjustments would be made in the claimed "*real-time.*"

## 2.    The Board Instituted Trial Despite The Petition's Deficiencies

Despite Progressive's thorough debunking of Liberty's Petition in its Patent

18

Owner's Preliminary Response, A6841-906, and even though the one-sentence

argument in Liberty's Petition did not come close to making Liberty's required

obviousness showing based on the NAIC paper, the Board instituted trial on that

basis for claims 1-8, 12-41, and 44-46.  A6965-66.  The Board also instituted trial

on claims 4-11, 42, and 43 under § 103 based on the NAIC paper and Lockwood.

A6966.  The Board did not address Liberty's anticipation argument on the merits

based on the NAIC paper, and its short "Analysis" on obviousness was superficial

and conclusory.  *See* A6956-59.

The Board construed the claim term "real-time" to have the same meaning

as the IEEE dictionary definition:

> pertaining to a system or mode of operation in which computation is
> *performed during the actual time that an external process occurs,* in
> order that the computation results can be used to control, monitor, or
> respond in a timely manner to the *external process*. Contrast: batch.
> See also: conversational; interactive; interrupt; on-line.

A6952-53 (emphases added).  Noticeably lacking from the Board's institution

decision was any guidance about the meaning of the definition's "external process"

in the context of the intrinsic evidence.

### 3.  Progressive Responded With A Detailed Showing That The NAIC Paper Alone, And Together With Lockwood, Did Not Teach Or Suggest The Claimed Inventions

In its Patent Owner Response, Progressive, as it finally was permitted to do,

supplemented the record with additional evidence, including the opinions of two

experts.  *See* A6990-7059; A7166-216; A7217-48; A7249-328.

The first of these experts, Cacchione, has over 34 years of relevant experience in the insurance industry.  A7217-23, ¶¶ 1-13; A7242-48.  As mentioned above, she served as a contributor on multiple working groups of the NAIC, including the NAIC paper, and was commended for her efforts.  A5089; A7230-31, ¶¶ 33-36.  Cacchione explained to the Board that, in July 1998, insurance policy adjustments were not made over the Internet in "real-time"; rather, the process "typically involved multiple people, generally at multiple locations, and took several days to complete."  A7227-29, ¶¶ 26-31.  She also explained that the NAIC paper "was commissioned to identify issues of regulatory concern."  A7230-31, ¶¶ 33-35.  Cacchione further described how one of ordinary skill in the insurance aspects of the art would *not* have viewed the NAIC paper "to suggest any change to an insurer's normal operation for processing claims, complaints, and policyholder services once a request was received from the consumer; or that processing of claims, complaints and policyholder services would be completed during the Internet session."  A7236-37, ¶ 47.

Kevin Jeffay, Ph.D., Progressive's other expert, is a tenured professor of computer science at the University of North Carolina at Chapel Hill with over thirty years of experience researching, designing, measuring, and teaching distributed and networked computer systems.  A7166-89, ¶¶ 1-4; A7190-216.  He

has used, studied, and measured the Internet since its inception in the 1990s. *Id.* Jeffay is a member of the IEEE Technical Committee on "Real-Time" Systems. A7193. "Real-time" systems are a research interest of Jeffay's, and he has taught high-level courses in "real-time" systems. A7167, ¶ 3. Jeffay also has spoken extensively about "real-time" systems. A7194-97.

Relying on Cacchione's analysis and opinions for an insurance perspective, Jeffay described how one of ordinary skill in the computer aspects of the art would have viewed the NAIC paper. A7168-69, ¶ 10. He explained why the NAIC paper failed to teach or suggest an operation that adjusts parameters in an existing insurance policy in "real-time" in response to data received from the policyholder. A7172-86, ¶¶ 15-37. He said that the skilled artisan would have understood that the NAIC paper was "at best, a series of aspirational statements of desired function . . . ." A7186, ¶ 34.

Progressive also addressed the Board's construction of "real-time," explaining that one of ordinary skill in the art would have understood the "external process" of the IEEE definition to be an online Internet session in the context of claim 1 and the '088 patent. A6997-7000. Progressive further explained why claims 1-8, 12-41, and 44-46 are patentable over the NAIC paper, A7000-54, and why Klausner's declaration did not overcome the deficiencies in the NAIC paper. A7033-37.

21

4.    **Liberty Offered, And The Board Improperly Allowed, New Evidence That Did Not Cure the Petition's Deficiencies**

Recognizing that its Petition's conclusory, single sentence could not possibly support an obviousness analysis or conclusion based on the NAIC paper, Liberty attempted unsuccessfully in its Reply to remedy its failure of proofs. A7639-59. It offered eleven substantive new exhibits, including a so-called "rebuttal" declaration from Klausner. *See* A7368-583. Over Progressive's objections, the Board erroneously admitted the supplemental exhibits and testimony. A5031-39; *see also* A7704-23; A7761-79; A7788-97.

Klausner's supplemental declaration mischaracterized Jeffay and Cacchione's declarations and the NAIC paper. For example, Klausner argued that the NAIC paper discussed "Internet capabilities – beyond mere email communications (or equivalent) – at length," and that insurance companies "were increasingly using sophisticated Internet websites." A7377, ¶ 7. In reality, the NAIC paper disclosed only a general overview of the "relatively new" 1990s-era Internet, cited complex regulatory obstacles for insurance companies, and provided no disclosure about how to technologically implement the aspirational goals it identified. A5094-95; A5097-102.

Liberty's lack of substantial evidence to support an obviousness conclusion is underscored by its failure to submit a "rebuttal" declaration from O'Neil, its only

witness with any insurance-related experience, or to offer testimony from anyone with expertise and knowledge comparable to Cacchione.  Indeed, Liberty never presented testimony from anyone with first-hand knowledge of the NAIC paper or actual experience with insurance policy adjustments.

### 5.    The Board's Final Written Decision

The Board's Final Written Decision (A5000-45) concluded that, by a preponderance of the evidence, claims 1-46 of the '088 patent are unpatentable for obviousness under § 103(a) based on the NAIC paper alone (claims 1-8, 12-41, and 44-46) and on the NAIC paper in combination with Lockwood (claims 4-11, 42, and 43).  A5041.  Progressive appeals that decision for the reasons below.

## IV.   SUMMARY OF THE ARGUMENT

This appeal involves one of the first Board decisions under the CBMPR provisions of the AIA.  The Board instituted CBMPR review of Progressive's '088 patent based on obviousness, even though Liberty's 80-page Petition focused almost exclusively on anticipation and devoted just one sentence to obviousness based on the NAIC paper.  The Board's Final Written Decision—lacking the requisite explicit analysis and legal and record support—erroneously held all claims of the '088 patent unpatentable due to obviousness and must be reversed.

First, the Board adopted a legally erroneous construction for the claim term "real-time."  The Board adopted verbatim an IEEE dictionary definition of "real-

23

time." However, the IEEE dictionary covers the electronics and electrical fields generally, and some of the definition's vague language required further refinement in view of the intrinsic evidence. Specifically, a skilled artisan would have understood from the intrinsic evidence that the term "external process," used in the dictionary's "real-time" definition, meant that the claimed adjustment features *must* occur during the same on-line Internet session.

By rejecting this clarification of "external process" and offering no guidance on the meaning of these words in the context of the '088 patent, the Board erred in its claim construction. Had the Board correctly construed "real-time," it would have understood that claim 1's recitation of insurance module adjustment features, including a feature that "adjusts the insurance policyholder's insurance policy parameter in *real-time* in response to second data received from the insurance policyholder," necessarily means that the claimed "real-time" features must occur during the same on-line Internet session.

Second, the Board's erroneous obviousness conclusion is accompanied by sparse and conclusory obviousness findings that do not explain how the NAIC paper suggests adjusting an insurance policy parameter of an existing insurance policy during an "external process." The Board's obviousness conclusion lacks the requisite substantial evidence and explicit analysis required to support it. Indeed, the record squarely contradicts the Board's findings.

The NAIC paper focused on regulatory concerns in the insurance industry, and, to the extent it commented on the Internet, the paper was aspirational and speculative about possible future use of the Internet by the insurance industry. It offered no guidance about how its stated hopes might be realized or achieved. However, in what had to have been a classic case of hindsight analysis, the Board read isolated passages of the NAIC paper in the context of today's sophisticated Internet, and not in the context of the far less-developed Internet of the late 1990s. Had the Board considered the NAIC paper both for what it said and for what it did *not* say, it could not reasonably or correctly have determined that the NAIC paper rendered the claimed invention obvious.

Third, for dependent claims 4-11, 42, and 43, and in addition to its erroneous claim construction and indiscriminate reading of the NAIC paper, the Board erred by *presuming* that Lockwood taught or suggested a claimed feature—namely, generating cost adjustments attributable to the policy adjustment and communicating the cost adjustment to the policyholder in real-time—unless and until Progressive showed that the feature was "preclude[d]" by Lockwood. In so presuming, the Board improperly relieved Liberty of its burden of proving a prima facie case of obviousness. Moreover, Lockwood addressed policy quotes for new, not existing, insurance policies, and, therefore, it does not disclose the claimed communication of adjustments to existing insurance policies. In combination with

25

the NAIC paper, Lockwood did not teach or suggest the inventions claimed in these dependent claims.

This appeal offers the Court a two-fold opportunity. First and foremost, the Court should reverse the Board's erroneous conclusion on obviousness. Second, the Court should take the opportunity to redirect the Board's approach to CBMPR to ensure it is consistent with the spirit and word of the AIA.[5]

## V.    ARGUMENT

### A.    Standard of Review

Claim construction by the Patent Office is a question of law that this Court reviews *de novo*. *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1352 (Fed. Cir. 2013). The Board gives a claim its broadest reasonable interpretation, but the construction cannot be divorced from the intrinsic evidence. *In re NTP, Inc.*, 654

---

[5] The Board's appetite for invalidating patent claims under Section 18 of the AIA has led some to call it a "patent death squad," an unfortunate, but perhaps not unfair, label, given that through the first three months of CBMPR decisions, the Board had a 100% invalidation rate for instituted claims. *See* John Stephens, What to Expect from Growing AIA Patent Challenges (June 30, 2014), *available at* http://www.law360.com/articles/551462/what-to-expect-from-growing-aia-patent-challenges. With this encouragement for accused infringers, the number of AIA petitions received as of September 2014 – 1,994 – far exceeds the number expected. *See* Patent Trial and Appeal Board, AIA Progressive (Sept. 11, 2014), *available at* http://www.uspto.gov/ip/boards/bpai/stats/aia_statistics_091114.pdf; *General Administrative Trial Final Rules*, 77 Fed. Reg. 48612, 48651 (Aug. 14, 2012) (estimating receipt of 470 and 510 AIA petitions in fiscal years 2013 and 2014, respectively).

F.3d 1279, 1287-88 (Fed. Cir. 2011).

The Board's obviousness conclusion is reviewed *de novo*, while its underlying fact findings are reviewed for substantial evidence. *In re Giannelli*, 739 F.3d 1375, 1378-79 (Fed. Cir. 2014); *Leo Pharm. Prods.*, 726 F.3d at 1353.

### B.    The Board Legally Erred In Construing "Real-Time" Contrary To The Intrinsic Evidence And The Understanding Of A Skilled Artisan

The Board's construction of the claim term "real-time" is wrong because it is contrary to the intrinsic evidence and the understanding of a person of ordinary skill in the art.  Specifically, the intrinsic evidence requires that the term "external process," used in the Board's generic dictionary definition of "real-time," *must* mean that the claimed actions occur during the same on-line Internet session.  The Board legally erred in concluding otherwise.

The IEEE definition of "real-time" adopted by the Board is generic to all electrical systems and applications.  In the context of the intrinsic evidence of the '088 patent, the "external process" referred to in that definition had to be an on-line Internet session.  *See* A5070-75, Fig. 3 (illustrating the flow process for the Internet session); col. 1, ll. 6-18; col. 1, ll. 46-53; col. 1, l. 57-col. 2, l. 10; col. 2, l. 58-col. 3, l. 8; *see also* A7169-72, ¶¶ 11-14.

While dictionaries may be "useful resources" in determining ordinary and customary meaning of a claim term, "the correct meaning of a word or phrase is

27

informed only by considering the surrounding text. . . . [which is] why resort must always be made to the surrounding text of the claims in question, the other claims, the written description, and the prosecution history." *See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1300 (Fed. Cir. 2003); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1322 (Fed. Cir. 2005) (en banc) (warning that even with technical dictionaries or treatises, "[t]here is no guarantee that a term is used in the same way in a treatise as it would be by the patentee."). Here, the "surrounding text" demonstrates the error in the Board's dictionary-based construction.

The first two limitations of claim 1 refer to "a web browser" and "a publicly accessible distributed network for transferring data from the web browser." A5078, col. 9, ll. 7-11; *see also* A7170-71, ¶ 12. The "real-time" insurance policy adjustment module in claim 1 receives data "through the publicly accessible distributed network and the web browser." A5078, col. 9, ll. 5-31; *see also* A7170-71, ¶ 12. The claim language therefore recites a manner of communication where data is exchanged between the policyholder and insurance company over the publicly accessible network, and "the time frame in which the insurance policy parameter is adjusted is defined by the time in which the *insurance policyholder's and insurance company's computers establish and exchange data over one or more network connections over the Internet (i.e., the on-line Internet session)*."

A7170, ¶ 12 (emphasis added).

Likewise, the specification illustrates the "interactive conversation between the on-line insurance policy service system and the insurance policyholder" and "the time period of interest is characterized by an on-line session that allows multiple responses and requests from the insurance policyholder and the insurance policy servicing system."  A7170-72, ¶¶ 12-13; A5070-77, col. 6, l. 37-col. 7, l. 22; col. 2, ll. 45-46,and Fig. 3.

The prosecution history confirms these teachings.  Thus, "[w]hen the patentee accepted the Examiner's suggestion 'to indicate that the policy changes are made in real-time,' support for the Examiner's suggestion was found in Figure 3, which . . . illustrates an on-line session that defines the period in which the computation occurs."  A7172, ¶ 14; A5603-13; A5614.

Progressive's expert, Jeffay, who provided the *only* expert testimony opining about how the IEEE definition of "real-time" would be understood,[6] testified that, based on the intrinsic evidence, it would be understood that "real-time" is "defined by the time in which the insurance policyholder's and insurance company's computers establish and exchange data over one or more network connections over

---

[6] Klausner, Liberty's "expert," merely accepted the definition of "real-time" that his counsel apparently "instructed" him to use, and he did not attempt to rebut Jeffay's construction.  A6531, ¶ 16.  The declaration of O'Neil, Liberty's insurance expert, never even mentioned the term "real-time."

the Internet (i.e., the on-line Internet session)."  A7170-71, ¶ 12; *see also* A7169-72, ¶¶ 11-14.  Although highly persuasive, the Board did not even acknowledge Jeffay's testimony in trying to defend its verbatim adoption of the IEEE definition.

Despite the consistent and extensive record, the Board, with virtually no analysis, accused Progressive of "import[ing] extraneous limitations into the claims" and of presenting positions "inconsistent with the specification."  A5009.  On the contrary, not only the specification, but all the relevant intrinsic evidence and the understanding of the skilled artisan support Progressive's showing that "external process" required a specific meaning in the Board's construction.  *See, e.g.*, A5078, col. 9, ll. 7-11; A5070-77; *see also* A5070-75, col. 1, ll. 6-18,col. 1, ll. 46-53, col. 1, l. 57-col. 2, l. 5, col. 2, ll. 45-46, col. 2, l. 58-col. 3, l. 8, col. 6, l.37-col. 7, l. 22, and Fig. 3; A5603-14; A7170-72, ¶¶ 12-14.

The Board not only rejected Progressive's position, A5006-10, but it also did not provide an alternative meaning for "external process" in the context of the patent and the understanding of the skilled artisan.  Thus, although the Board recited the correct legal standard for construing claims,[7] it failed to follow that

---

[7] "In a covered business method patent review, claim terms are given their broadest interpretation *in light of the specification* of the patent in which they appear. 37 C.F.R. § 42.300(b).  Under the broadest reasonable interpretation standard, claim[] terms are given their ordinary and customary meaning as would be *understood by one of ordinary skill in the art* in the context *of the entire*

legal standard when construing "real-time."[8]

As this Court has held, "[w]hile the Board must give the [claim] terms their broadest reasonable construction, the construction cannot be divorced from the specification and the record evidence." *See NTP*, 654 F.3d at 1288.  The Board's construction of "real-time," contrary to this Court's controlling precedent, is divorced from the intrinsic evidence.  It must be reversed.  *See id.*

### C. The Board Legally Erred In Its Obviousness Determination For Claims 1-8, 12-41, And 44-46

#### 1. Substantial Evidence Does Not Support The Board's Obviousness Findings

A patent claim is not obvious unless "'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex Co.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. §103(a)).  The obviousness conclusion is drawn from an inquiry of the underlying facts, including

---

disclosure.  *In re Translogic Tech. Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007)." A5006-07 (emphases added).

[8] The Court's construction error also permeates dependent claims 42 and 43 where the cost adjustment to the insurance policy must be communicated to the policyholder in "real-time."  A5081, col. 1, l. 21 – col. 2, l. 14.

the scope and content of the prior art, differences between the claimed subject matter and the prior art, and the level of ordinary skill in the pertinent art. *Id.*[9]

Although the Board correctly cited *KSR* for the relevant factors in an obviousness analysis (A5014; A5022), substantial evidence did not support the Board's findings. Specifically, the Board: (a) failed to understand that the NAIC paper was a non-technical, regulatory document (A5023-25; A7041-45); (b) incorrectly rejected Progressive's evidence showing that the cited passages of the NAIC paper, alone or together, failed to teach "real-time" adjustments to insurance policies (A5017-21; A7000-38); and (c) incorrectly ignored Progressive's evidence showing that the NAIC paper *as a whole*, did not teach "real-time" policy adjustments (A5022; A7038-45). Each of these errors demonstrates that the Board's decision was not supported by substantial evidence, and each alone requires reversal. *See In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1030-31 (Fed. Cir. 2011); *In re Baker Hughes Inc.*, 215 F.3d 1297, 1304 (Fed. Cir. 2000).

---

[9] Progressive does not challenge the Board's findings on the level of ordinary skill in the art, except to the extent they require skill in adjusting new insurance policies, as opposed to the claimed "existing" insurance policies. A5013-14.

a.    **The NAIC Paper Was A Regulatory Document That Suggested Desirable Results, But Failed To Disclose Or Suggest How To Achieve Them**

The Board vastly overstated the importance of the NAIC paper by referring to it as "a white paper or an authoritative report or guide." A5013. While it may be considered a "white paper" with respect to details of the insurance industry's regulatory issues in the context of the Internet, and was characterized as such in the paper, A5091, the NAIC paper is anything but "authoritative" on technical aspects of Internet-based distributed systems and does not hold itself out as such.

There is an absolute dearth of technical details in the NAIC paper, perhaps because it was crafted by insurance professionals rather than by Internet technology specialists. To the extent the paper sheds any light on technology, it reveals an Internet in its "infancy," and to read it otherwise, one would have to engage in hindsight. *See* A5108; A7182-84, ¶¶ 29-30; *supra* Part III.C. Hindsight must be carefully avoided in reading into the NAIC paper what is commonly known about the Internet today. *See InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1347-48 (Fed. Cir. 2014) ("We must also keep in mind that which may be made clear and thus 'obvious' to a court, with the invention fully diagrammed and aided, . . . may have been a breakthrough of substantial dimension when first unveiled.") (internal citation omitted); *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011) (cautioning that "the great

33

challenge of the obviousness judgment is proceeding without any hint of hindsight.").

The Board's Final Written Decision provided only a high-level summary of the NAIC paper by repeating some of its conclusory statements. A5016-17. The decision does not reflect any critical review of what the NAIC paper actually disclosed and did not disclose. For example, the Board overlooked that the NAIC paper focused on regulatory issues and undeniably speculated about what lay ahead for the insurance industry's use of the Internet. *See, e.g.*, A5119 (stating that further discussion would be necessary to adequately address "issues and potential transactional guidelines pertaining to conducting the business of insurance over the Internet"); *see also* A5089; A5094-97; A5105; A5108-09; A5110; A5117; A5121; A7222-31, ¶¶ 11, 33-36; A7172-88, ¶¶ 15-37.

With respect to technology, the NAIC paper was non-specific to the highest degree, speculating that "innovations will certainly continue to develop" and interactive web sites will become more prominent in the future. A5096; A5105. The paper did not contain any details about how these web sites would eventually operate and how their systems would be implemented. As Jeffay testified, one of ordinary skill in the art would have understood that the NAIC paper did *not* change the manner in which the insurance companies had been making policy changes

34

other than how the initial request and confirmations were sent.  *See* A7180-85, ¶¶ 26-31.

In other parts ignored by the Board, the NAIC paper speculated about what might be possible in the future, stating, for example, that "[t]he Internet is relatively new and its popularity, and therefore dramatic growth in usage, have continued in recent years. Still, an important question is how the Internet will develop as a tool in the insurance marketplace."  A5094.

Perhaps most importantly, the claimed "real-time" processing of policy changes in response to policyholder requests over the Internet is not mentioned in *any* passage of the NAIC paper.  The paper's speculative statements merely introduced a general idea without showing any evidence of how to design, develop, or implement the general idea; instead, the NAIC paper left these areas for further inventions by others.  Speculation does not establish obviousness.  *See Star Sci.*, 655 F.3d at 1376.

Regarding the speculative and generalized descriptions in the NAIC paper, a claimed invention is not obvious under 35 U.S.C. § 103 where what might have been obvious was merely "'to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.'"  *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 997

(Fed. Cir. 2009) (quoting *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988)).

The NAIC paper, with its conjecture and thin descriptions, did not provide even

"general guidance" about the claimed invention of the '088 patent or how to

achieve it.

> **b.     The Passages Of The NAIC Paper Relied On By The Board Did Not Teach Or Suggest The Claimed Invention**

Though the Board acknowledged that the NAIC paper must be read as a

whole and professed to have done just that, A5022, the Board instead relied on

isolated passages found on pages 8 and 9 of the paper to support its obviousness

conclusion.  A5018-21.  Neither of these passages, nor the NAIC paper read as a

whole, teaches or suggests the claimed "insurance policy adjustment module"

feature and corresponding "in real-time in response to" adjustment aspect.

> **i.     Page 8 Does Not Teach Or Suggest The Features Of Claim 1**

The Board again slipped into hindsight to find that the phrase "instant

transactions and communications" in an isolated passage on page 8 of the NAIC

paper is not limited to traditional instant transactions, "but instead encompasses

instantaneously adjusting an insurance policy parameter."  A5020; *see also Star

Sci.*, 655 F.3d at 1375.  This forward-looking passage, with its abstract reference to

a future "ability to conduct instant transactions and communications" does not

teach or suggest any such thing:

36

> As indicated, insurance producers are also establishing
> Web sites on the Internet, and tens of thousands of
> producers already have some type of Internet presence.
> While many of these Web sites simply provide general
> insurance information and a producer's phone number
> and address, increasing numbers of producers are
> developing sophisticated, interactive Web sites. Many of
> these sites are allowing producers to offer added value to
> consumers in new and innovative ways. Producers, like
> their company counterparts, are beginning to offer
> consumers enhanced customer support and service. *These
> innovations will certainly continue to develop*. In
> addition to the benefits provided to consumers in this
> regard, producers benefit by the realization of market
> efficiencies, enhanced interfacing and information
> exchange, and *the ability to conduct instant transactions
> and communications*.

A5096 (emphases added).

Jeffay and Cacchione testified that one of ordinary skill in the art would *not*

have found the general reference in the passage to "instant transactions and

communications" to teach the specifically claimed feature of adjusting an

insurance policy parameter of an existing insurance policy in "real-time" in

response to data received from the insurance policyholder through the publicly

accessible distributed network and the web browser.  A7182-83, ¶ 29; A7227-35,

¶¶ 26-31, 43-45; A5096.  There was *no contrary evidence*; Liberty provided only

Klausner's conclusory and uninformed statements.  Thus, the record establishes

that the skilled artisan would not have read the page 8 passage as the Board read it.

*Id*.

37

Rather, as Cacchione explained, a person of ordinary skill would have recognized the reference to "instant transactions and communications" to refer to the efficiencies provided by the instantaneous nature of communications submitted via the Internet, particularly email. A7234, ¶ 45; A5096. The NAIC paper referred to these communications generically as "transactions" inasmuch as they may have pertained to the submission of information related to an insurance policy transaction, such as an online request for a quote. *Id.* To the extent that a communication included a request to change an existing insurance policy, the request would be processed by the insurer according to traditional procedures, using the assistance of insurance personnel, which could take several days, as opposed to being conducted in "real-time." *Id.*; *see also* A7217-41, ¶¶ 26-31.

The passage's mention of "transactions and communications" also does not inherently include the claimed "real-time" insurance policy adjustment features. That phrase could refer to any number of types of transactions or communications. For example, it might refer to a new policy quote transaction. *See, e.g.*, A5095 ("Some sites will also provide on-line requests for quotation (RFQ) forms. RFQs typically involve a questionnaire that the consumer must complete to obtain an instant quote for insurance."). Or it might refer to communicating information to the insurance company. *See, e.g.*, A5108 ("Insureds will soon be able to instantaneously advise their insurance company of changes in motor vehicles,

38

purchase of property, etc., and will be able to report a loss just as swiftly."). Neither of these examples of "transactions and communications," nor anything else disclosed in the NAIC paper, teaches or suggests the specifically claimed features because they do not concern the "real-time" adjustment of a parameter of an existing insurance policy.[10]

The Board cast aside Jeffay and Cacchione's testimony and the important deficiencies in the NAIC paper by pointing to "NAIC's disclosure regarding the advantages associated with conducting insurance services via the Internet." A5018.  For alleged support, the Board cited the NAIC paper's statement that "consumers currently have the ability from at least one auto insurer to complete the entire transaction on-line." *Id.* (citing A5101-02).  However, the NAIC paper did not say what type of "entire transaction" is completed, or how it is completed.  The sentences before and after the cited text refer to obtaining quotes or submitting a completed application.  *See* A5101-02.  While the results of requesting a quote for a new policy may be communicated over the Internet, and therefore be entirely

---

[10] Also, the passage speaks of the benefit to *producers,* i.e., agents or intermediaries (A5091, n.1), to conduct instant transactions and communications. A5096.  In other words, they would now have the ability to receive electronic (e.g., emailed) requests for changes and execute them on behalf of their insureds. *See also* A7234-35, ¶¶ 43-45; A7180-7182, ¶¶ 25-29.  The '088 patent, on the other hand, focuses on the policyholder being able to adjust the policy on his or her own, in "real-time," without the involvement of a producer/agent.  *See, e.g.,* A5074, col. 2, l. 65 – col. 3, l. 8.

"completed online," there is no suggestion that the transaction is completed in "real-time." Further, there is no suggestion in the NAIC paper of modifying a parameter of an existing insurance policy in "real-time," nor is there any suggestion that a transaction is anything more than the completion of a two-way communication.

The Board also cited the NAIC paper's statement that "[c]onsumers already have the ability from at least one company to review their account status to determine when and how much they need to pay to maintain their existing policy . . . . This service eliminates the two step process of calling the company to find out how much is owed and then mailing a payment." A5019 (citing A5102). Again, however, this broad and vague statement gives no indication that the insurance company does anything in "real-time" in response to consumers reviewing their account status, nor does it suggest modifying an insurance parameter in "real-time."

From these generalized statements of desirable benefits, the Board found that "one with ordinary skill in the art would have recognized that such 'instant transactions and communications' [on page 8 of the NAIC paper] refer to an insurance service that allows a prospective insurer to conduct an entire transaction via the Internet." A5019; A5096. The Board cited no evidence to support its

supposition, and there is none.  It is mere speculation.[11]  The Board's finding is not even one of the advantages prophesied on page 8 of the NAIC paper, given all of the regulatory concerns and the rudimentary nature of the Internet in 1998.  *See, e.g.*, A5101-02; A5105-06; A5096.

The absence of support for the Board's finding underscores that the Board must have read the NAIC paper in hindsight to infer common knowledge about today's Internet, something this Court previously has cautioned the Board against.  *See NTP*, 654 F.3d at 1299.  The NAIC paper reminds us that in 1998 consumers accessed the Internet "typically through ordinary telephone lines and modems."  A5094.  The page 8 passage reminds us that in 1998 "many of these Web sites simply provide[d] general insurance information."  A5096.  It was from this nascent state of the art that the NAIC paper stated that "producers are developing sophisticated interactive Web sites."  *Id.*  One cannot assume, without engaging impermissible hindsight, that the "interactive Web sites" in 1998 were anywhere near the equivalent of the state of the art of today's sophisticated Internet.

---

[11] The Board's statement that the NAIC paper permits "a *prospective* insurer to conduct an entire transaction via the Internet" shows that the Board had new policyholders in mind, not existing ones.  A5019 (emphasis added).  However, the '088 patent claims an invention relating to existing, not new, insurance policyholders.  *See, e.g.*, 5074-78, col. 1, ll. 45-54; col 9, ll. 12-19, 32-37.

Even apart from the Board's erroneous inferences drawn from hindsight, the page 8 passage stated merely that "producers benefit by . . . the *ability* to conduct instant transactions and communications." *Id.* (emphasis added). The "ability" to conduct undefined "transactions" of any or all kinds, with no guidance whatsoever about implementation does not, in its vagueness, teach or suggest the specific claimed insurance policy modifications executed in "real-time." *See Star Sci.*, 655 F.3d at 1376 (holding that reference's discussion of what "might" or "may" or "seems" to lead to nitrite and TSNA production does not suggest obviousness); *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361(Fed. Cir. 2011) ("To render a claim obvious, prior art cannot be 'vague' and must collectively, although not explicitly, guide an artisan of ordinary skill towards a particular solution.").

### ii.    Page 9 Does Not Teach Or Suggest<br>The Features Of Claim 1

With respect to the page 9 passage, the Board acknowledged that it "does not indicate explicitly that changing coverage or beneficiaries to a respective insurance policy occurs in 'real-time.'" A5021. Nonetheless, the Board found that "one with ordinary skill in the art would have appreciated that such transactions may be 'instant' in nature." *Id.* The passage does not support the Board's leap in logic.

This forward-looking passage is found in an isolated, hypothetical discussion about when consumers "without Internet service" might typically interact with their insurance companies:

> Consumers who use the Internet *may* experience increased interaction with their insurance companies and producers. A typical insurance consumer, *without Internet service,* only interacts with an insurance carrier on four occasions: 1) when the insurance is purchased, 2) when the insurance premium is paid, 3) when a claim is made on the policy, and 4) when changes in coverage or beneficiary are made. Consumers *may*, therefore, be *more likely* to use this medium to make their initial insurance purchase *if* all of these interactive elements are available over the Internet. Because the processing of claims, complaints and policyholder services are probably the most important aspects of the insurance transaction for consumers, providing consumers with on-line claim, complaint and policyholder service access *should* increase consumer familiarity with and confidence in insurance on-line services. Many companies and producers *are beginning* to service customers on-line who purchased their products in the same manner believing the same preference that led them to use the Internet instead of conventional distribution will translate into a preference for service the same way.

A5097 (emphases added).

This passage reveals the highly speculative nature of the potential benefits of an evolving Internet by its use of equivocal qualifiers such as "may," "more likely," "if," and "should."  A5097; A7236-37, ¶¶ 46-48; A7182, ¶ 28; *cf. Star Sci.*, 655 F.3d at 1376.  When the passage mentioned a typical consumer's four interactions with an insurer, it emphasized that they occurred "without Internet

service." A5097. Within that specific context, the passage generally stated that insurers "are beginning to service customers on-line." *Id.* By contrast, this passage did not state or suggest which types of services were beginning to appear on-line or how any such on-line services were implemented. A7236-37, ¶¶ 46-48; A7182, ¶ 28.

Most importantly, the page 9 passage did not teach or suggest the claimed "real-time" policy adjustment features. It merely suggested that a policyholder *may* be more likely to use the Internet to make an insurance purchase *if* other insurance carrier interactions were available over the Internet. Moreover, the passage did not disclose that "real-time" processing of services for existing insurance policies occurred when a communication was made. Thus, as Cacchione testified, the skilled artisan would not have understood this passage to suggest any change to an insurer's normal operation for processing claims, complaints, and policyholder services once a request was received from the consumer. A7236-37, ¶ 47. Rather, that skilled artisan would have understood that there would *not* be a "real-time" connection between the user's transmission of the change request and the insurance company's execution of the change request in the NAIC paper. A7182-84, ¶ 28-30; A7236-37, ¶ 47; A5107-09.

The lack of a "real-time" connection for policy coverage modifications was further shown by the passage's inclusion of "claims" and "complaints" in the list of

possible on-line services. Even today, insurers do not immediately process claims or complaints in "real-time" over the Internet because, as Cacchione explained, claims and complaints are always investigated before being paid. A7236-37, ¶ 47. Any suggestion to the contrary contradicts industry practice and lacks common sense. Notably, Liberty did not provide a reply declaration from its insurance expert rebutting Cacchione's testimony on this or any other point, including the standard operation in the insurance industry at the relevant time.

Nevertheless, the Board summarily dismissed this evidence, stating that "[a]lthough NAIC's disclosure at page 9 does not indicate explicitly that changing coverage or beneficiaries to a respective insurance policy occurs in 'real-time,' one with ordinary skill in the art would have appreciated that such transactions *may* be 'instant' in nature." A5021 (emphasis added). The Board's equivocal use of "may" in its speculative finding underscores the lack of record support, as does the Board's reliance on Liberty's "expert," Klausner, whose declarations demonstrated a glaring lack of the required reasoning and support for his opinions. *See Innogenetics N.V. v. Abbott*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (excluding "vague" expert testimony); *see also InTouch Techs.*, 751 F.3d at 1350-52 (rejecting district court's reliance on expert testimony that, *inter alia*, failed to focus on the relevant time frame or provide sufficient reasons for the expert's opinions, holding that it "did not even come close" to supporting obviousness).

45

In discussing the page 9 passage, the Board also criticized Progressive and its experts for not addressing a passage found on pages 13-14 of the NAIC paper. A5021; A5097; A5101-02. The Board's criticism was misplaced. First, Liberty's Petition and the Board's decision instituting trial relied on pages 4, 8, 9, 17, and 20, and Appendices A and B of the NAIC paper. *See* A5183-84; A6946; A6956-57. In its Patent Owner's Response, Progressive and its experts responded to those parts of the NAIC paper. A7001-37. For the Board to have then turned around and faulted Progressive for failing to respond specifically to newly selected parts of the NAIC paper was wrong. *See Rambus Inc. v. Rea*, 731 F.3d 1248, 1255-56 (Fed. Cir. 2013) (requiring the Board in *inter partes* proceedings to provide applicants "an opportunity to respond" whenever it relies on "new facts and rationales not previously raised to the applicant").

Second, the passage cited by the Board, read in context, concerns insurance policy purchases, *not* the claimed policy servicing. Thus, the cited passage, which states that "consumers currently have the ability from at least one auto insurer to complete the entire transaction on-line," A5101, focuses on consumer opportunities to "shop" for insurance and obtain a "quote." *Id.* The passage also mentions that an insurer "forwards the application to a producer located near the consumer to complete the transaction," again, addressing new policy purchases, *not* servicing existing policies.

46

Third, the passage merely identified aspirational results. A5101-02. While

the Board characterized those passages as "not limited to email communications

between an insurer and consumer," email was the only form of Internet-based

communication described in the NAIC paper. *See, e.g.*, A5144 (defining "E-mail"

as "Messages transmitted over the Internet from user to user."); A5117 ("The

Internet offers regulators and industry a much faster and economical means of

communication through the use of e-mail."). Moreover, the Board did not dispute

that e-mail communication between a consumer and an insurance

agent/representative, in the manner described in the NAIC paper, did not meet the

"real-time" insurance policy adjustment features of the '088 patent. *See* A5017-25.

### c.    Progressive Showed That The NAIC Paper As A Whole Failed To Teach Or Suggest "Real-Time" Policy Adjustments

The Board admonished Progressive allegedly for "fail[ing] to discuss

NAIC's disclosure as a whole." A5021. At the same time, this portion of the

Board's decision has no discussion of the NAIC paper as a whole or how the cited

passages would be interpreted in the context of the rest of the paper's teachings.

Moreover, the Board admittedly focused its discussion narrowly on pages 8 and 9

of the NAIC paper, s*ee* A5017 ("our analysis focuses on Progressive's arguments

directed to pages 8 and 9"), while ignoring that Progressive also provided the

Board with the many reasons why the NAIC paper could not be relied upon to

47

support an obviousness case, both with respect to the discrete passages Liberty and the Board had relied upon, *and* with respect to the document as a whole. *See* A7041-45.

For example, in its Patent Owner's Response, Progressive, after going through all the parts of the NAIC paper relied on by Liberty, addressed the disclosures of the NAIC paper "generally," quoting passages from pages 20 and 28, to show that at the time it was written, "there was not much available on-line insurance functionality." A7041-42; A5108; A5116. Progressive continued, showing that "[i]n other areas of the paper, NAIC speculates as to what may be possible in the future," quoting from pages 6 and 9 of the paper. A7042-45; A5094; A5097. Progressive then explained that "NAIC also makes clear that further in-depth review will be necessary to delve deeper into the specifics of on-line insurance transactions," quoting from page 1. A7043; A5089.

The record in fact shows that only Progressive read the NAIC paper in context and *as a whole*. Progressive explained in detail how the NAIC paper as a whole would be read by a person of ordinary skill in the art, and supported its explanation with expert testimony. A7000-38. Other than Progressive's evidence, the record is bereft of evidence (as opposed to conclusory speculation) of the NAIC paper having been read properly in context and as a whole. A5022.

48

## 2.    The Board Did Not Conduct A Proper Obviousness Inquiry

The Supreme Court requires that an obviousness determination be accompanied by an "explicit" obviousness analysis in support.  *See KSR*, 550 U.S. at 418; *see also In re Giannelli,* 739 F.3d at 1380-81 (reversing the Board's conclusion of obviousness because the Board provided "no explanation why or how a person having ordinary skill in the art would modify the prior art . . . to arrive at [the claimed apparatus]").[12]  The Board's Final Written Decision lacks the legally required analysis to support its erroneous obviousness determination.

As explained above, the Board relied on excerpts of the NAIC paper in isolation, which alone or combined, did not teach or suggest the claimed invention.  The Board's conclusory, sweeping statements could not hide this fact.  The Board apparently decided that the holes in the NAIC paper could be filled by the testimony of Liberty's expert, Klausner, that "one with ordinary skill in the art

---

[12] The Board's failure to provide an explicit, supported obviousness analysis also disregards that an "agency tribunal must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts."  *In re Sang-Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).  "Omission of a relevant factor required by precedent is both legal error and arbitrary agency action."  *Id.* at 1344 (citations omitted); *see also In re Zurko*, 258 F.3d 1379, 1385 (Fed. Cir. 2001) (holding that "deficiencies of the cited references cannot be remedied by the Board's general conclusions about what is 'basic knowledge' or 'common sense.'").

would have recognized that NAIC's disclosure of changing coverage or beneficiaries to a respective insurance policy amounts to adjusting an insurance policy." A5020 (citing A6536-37, ¶ 28; A7377-78, ¶ 7). The Board's reliance on Klausner did not fill the gap.

In the first place, Klausner rendered his opinions in reliance on a construction of "real-time" rejected by the Board as not within the context of the term's ordinary and customary meaning. A6952-53; A6531, ¶ 17. Moreover, Klausner did not accurately paraphrase what the NAIC paper actually stated; did not explain how the knowledge of one of ordinary skill in the art would have supplemented the NAIC paper's disclosure; and did not explain how one of ordinary skill would have modified the NAIC paper to teach the policy adjustment module and "real-time" processing of claim 1. *See* A6534-37, ¶¶ 25-28. All Klausner offered was the unhelpful, conclusory statement that "it would have been understood by one of ordinary skill that the web server (and any connected back-end systems) would perform its function in real-time." A6536-37, ¶ 28; *see Upjohn Co. v. MOVA Pharm. Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 2000) ("[T]here must be factual support for an expert's conclusory opinion" in the determination of obviousness).

In addition, Klausner has no prior experience or expertise with adjusting insurance policies and admittedly never consulted with Liberty's insurance expert

to gain insight on such expertise.  *See* A7118-20, at 93:25-98:19; A7129, at 136:6-137:5.  The only two witnesses with first-hand experience in the insurance industry in the mid-1990s were Cacchione and O'Neil.  Cacchione provided well-supported reasons why one of ordinary skill in the insurance industry in 1998 would not have recognized the NAIC paper as disclosing "real-time" changes of insurance policy parameters.  *See* A7227-41, ¶¶ 26-56.  O'Neil did not dispute that point.  Yet the Board ignored Cacchione in favor of Klausner, who opined on what he believed was technologically possible in 1998 (but was not disclosed in the NAIC paper), regardless of whether he knew how insurance transactions worked.  A5020-21.

For example, inaccurately characterizing and string-citing several passages of the NAIC paper, Klausner concluded without analysis or support that "it would have been understood by one of ordinary skill that the web server (and any connected back-end systems) would perform its functions in real-time."  A6536-37, ¶ 28.  Klausner's lack of analysis was "fraught with hindsight bias" and should have been rejected by the Board.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012); *see also NTP*, 654 F.3d at 1299; *Innogenetics*, 512 F.3d at 1373.  Klausner's unreliable, inadequate testimony is not substantial evidence of obviousness, and cannot rescue the Board's inadequate analysis or its legally erroneous conclusion.

**D.    The Board Also Legally Erred In Its Obviousness Determination For Claims 4-11, 42, And 43**

Claims 4-11, 42, and 43 depend from independent claim 1. The Board legally erred in holding these dependent claims obvious in light of the NAIC paper in combination with Lockwood.  A5041.  As explained above, the NAIC paper does not teach or suggest the invention of claim 1.  Neither the Board nor Liberty explained how Lockwood could overcome the shortcomings of the NAIC paper for the features of independent claim 1.  A5026-30.  Therefore, claims 4-11, 42, and 43 are patentable over the combination of the NAIC paper and Lockwood for at least the same reasons discussed above with respect to claim 1.  *See supra* Parts V.B.-C.2.  Dependent claims 9-11, 42, and 43 are patentable over the combination of NAIC and Lockwood for the following additional reasons, and the Board erred in concluding otherwise.

**1.    The Board Erroneously Placed The Initial Burden On Progressive To Prove Non-Obviousness**

Apart from the errors relating to the "real-time" limitation of independent claim 1, the Board erred in invalidating dependent claims 9-11, 42, and 43 in view of Lockwood and the NAIC paper.  The telltale sign of how far astray the Board went in reaching its obviousness conclusion is its treatment of Lockwood's alleged disclosures:  "our analysis focuses on how the textual portions of Lockwood relied

on by Liberty *do not preclude* communicating price adjustments . . . ." A5028 (emphasis added).

In other words, instead of requiring Liberty to prove that Lockwood *in fact* disclosed a claimed feature, the Board *presumed* the presence of that feature in Lockwood, and implicitly required Progressive to prove that the price adjustment feature was "preclude[d]" by Lockwood.  This approach turned the obviousness analysis on its head and was wrong as a matter of law.  *See Rambus*, 731 F.3d at 1255 (holding that the Board's reasoning requiring the patentee to "demonstrate[] that skilled artisans . . . would not have been able to arrive at the broadly claimed invention" erroneously placed the burden on the patentee to prove that its claims were not obvious).

### 2.    The Non-Obviousness Of Claims 9-11

Dependent claim 9 provides additional detail regarding an acknowledgement provided by the insurance policy adjustment module to the web browser in response to the adjustment of the selected insurance policy parameter within the existing insurance policy.  Specifically, the "acknowledgement" in claim 9 is described as comprising "a price of the adjustment to the selected insurance policy parameter."  A5078, col. 10, ll. 5-7.  The Board does not dispute that the "selected insurance policy parameter" recited in claim 9 concerns an insurance policy parameter for an *existing* insurance policy.  A5028-29.

53

Liberty did not allege that any acknowledgement in the NAIC paper comprised a price of an adjustment to a selected insurance policy parameter. Rather, Liberty cited only to Lockwood for the features added by claim 9. A5205-06. However, Lockwood does not overcome the shortcomings of the NAIC paper with respect to the features of claim 9.

The insurance policy quotes in Lockwood are quotes for *new* insurance policies. *See, e.g.*, A5147-57, Abstract (describing "prospective" customers); col. 2, ll. 8-19 (providing insurance "quotations" from "various companies"); col. 3, ll. 33-40 (describing "prospective" insurance purchaser receiving a series of "quotations" from "various institutions"); col. 4, ll. 64-66 (detecting the presence of a "prospective" customer); col. 5, l. 44 – col. 6, l. 32 (describing an insurance "quotation" process). Lockwood is not concerned with and does not disclose making adjustments to the claimed *existing* insurance policies.

The Board did not take issue with this point, but nonetheless held that claims 9-11 were obvious in view of Lockwood. According to the Board:

> Even if we presume that Lockwood is limited to communicating quotes to a consumer for a new insurance policy, Liberty, nonetheless presents sufficient evidence indicating that one with ordinary skill in the art would have recognized that Lockwood's system possesses the capability to generate and communicate price adjustments associated with changing a parameter of an existing insurance policy.

A5029. The Board relied only on paragraph 40 of the O'Neil declaration as alleged support. However, O'Neil's testimony on this point fell far short of

54

supporting this finding. Paragraph 40 began with a conclusory statement that it would have been obvious to adapt Lockwood's system for new policies to adjusting the parameter of an existing policy. A6674, ¶ 40. O'Neil then tried to support that statement with a technical discussion of Lockwood, but there is no evidence that she has the education or ability to have read and understood the technological aspects of Lockwood. A7074, 50:18-51:6. O'Neil's conclusion lacks a proper foundation, and therefore does not constitute substantial evidence. *See In re Deters*, 515 F.2d 1152, 1155 (CCPA 1975).

After failing to critically analyze Liberty's purported evidence, the Board further erred by stating that, "Progressive does not present sufficient or credible evidence that communicating price adjustments associated with changing a parameter of an existing insurance policy is beyond the level of an ordinary skill[ed] artisan." A5029-30. The Board's rationale and conclusion are not well-founded and erroneously placed the burden of demonstrating non-obviousness over Lockwood on Progressive. *Rambus*, 731 F.3d at 1255.

The Board failed to mention that Liberty's Petition did not argue that it would have been obvious to adapt Lockwood's system for new insurance quotes to modifying *existing* insurance policies. Liberty first raised this argument in its Reply, an improper tactic permitted by the Board that significantly hampered Progressive's ability to offer rebuttal evidence. A7653-54. Nevertheless, at oral

argument, Progressive explained how and why endorsing changes to existing insurance policies is a far more complex process than rendering quotes or writing new insurance policies.  *See* A7886-88; *see also* A7822-26.  For example, changes to existing policies reach back in time and may implicate multiple rate revisions (sophisticated and detailed rate calculations filed with each state's insurance regulatory agency) that have taken place since the policy was created.  A7886-87. Further, a change in one policy parameter affects several insurance products contained under the same umbrella policy, and therefore, requires additional underwriting and rating determinations to be made for each of the several policies and insurance products.  A7887-88.

The NAIC paper explained the complex regulatory framework for insurance policies, and there is no evidence in the record that the regulatory constraints on the insurance industry permitted processes for new policies to be implemented without change for making adjustments to existing policies. *See, e.g.*, A5119 (concluding that further discussion would be necessary to adequately address "issues and potential transactional guidelines pertaining to conducting the business of insurance over the Internet").

### 3.    The Non-Obviousness Of Claim 42

Claim 42 recites that "the insurance policy adjustment module is further configured to generate in real-time an insurance policy cost adjustment attributable

to the adjustment of the insurance policyholder's insurance policy parameter, and where the insurance policy adjustment module is also further configured to communicate the insurance policy cost adjustment in real-time in the customized insurance document sent to the insurance policyholder over the publicly accessible distributed network." A5081, col. 1, ll. 23-31. Liberty and the Board relied exclusively on Lockwood for these insurance policy cost generation and communication features of claim 42. A5207. However, Lockwood did not disclose or suggest the claimed features.

As discussed above in connection with claim 9, the insurance policy quotes in Lockwood are quotes for *new* insurance policies, and Lockwood did not disclose making adjustments to existing policies. For example, the Board did not identify any functionality in Lockwood where the system would generate an insurance policy cost adjustment attributable to the adjustment of a policyholder's insurance policy parameter, such as by comparing the current cost associated with an existing insurance policy (e.g., the cost before the parameter adjustment) to the new cost associated with the existing insurance policy (e.g., the cost after the parameter adjustment). *See* A5026-30. Similarly, if any cost information were communicated to the consumer in Lockwood, then that communication would include the insurance costs associated with a new insurance policy, not a cost adjustment attributable to the adjustment of a policyholder's parameter of an

existing insurance policy.  *See* A5148-56, col. 3, ll. 51-55; Fig. 1.  Claim 42 is

patentable over the proposed combination of the NAIC paper and Lockwood.

### 4.    The Non-Obviousness Of Claim 43

Claim 43 recites that "the insurance policy adjustment module is further

configured to generate an insurance policy cost adjustment attributable to the

adjustment of the insurance deductible or policy limit, and where the insurance

policy adjustment module is also further configured to communicate the insurance

policy cost adjustment to the insurance policyholder over the publicly accessible

distributed network in real-time in the customized insurance document."  A5081,

col. 2., ll. 6-14.  The combination of NAIC and Lockwood does not disclose the

claimed features of claim 43 for at least the same reasons as discussed above for

claim 42.

## VI.    CONCLUSION AND RELIEF REQUESTED

The Board legally erred in concluding that the preponderance of the

evidence rendered all claims of the '088 patent unpatentable for obviousness under

35 U.S.C. § 103(a).  This Court should reverse.

September 25, 2014                    Respectfully submitted,

                                      */s/ James R. Sobieraj*
                                      James R. Sobieraj
                                      Cynthia A. Homan
                                      James A. Collins
                                      Laura A. Lydigsen
                                      Nicholas A. Restauri
                                      BRINKS GILSON & LIONE
                                      455 N. Cityfront Plaza Drive
                                      Suite 3600
                                      Chicago, Illinois 60611

                                      *Counsel for Appellant*,
                                      *Progressive Casualty Insurance Co.*

**ADDENDUM**

## ADDENDUM TABLE OF CONTENTS

Final Written Decision of the
United States Patent and Trademark Office
Patent Trial and Appeal Board
     entered February 24, 2014 .................................................................. A5000

U.S. Patent No. 7,124,088,
     filed July 30, 1999 ............................................................................ A5067

Trials@uspto.gov                                                                              Paper 59
571-272-7822                                                               Entered:  February 24, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____


LIBERTY MUTUAL INSURANCE CO.
Petitioner

v.

PROGRESSIVE CASUALTY INSURANCE CO.
Patent Owner

_____

Case CBM2012-00010
Patent 7,124,088 B2

_____


Before JAMESON LEE, JONI Y. CHANG, and MICHAEL R. ZECHER,
*Administrative Patent Judges.*


ZECHER, *Administrative Patent Judge.*


FINAL WRITTEN DECISION
*35 U.S.C. § 328(a) and 37 C.F.R. § 42.73*


**A5000**

Case CBM2012-00010
Patent 7,124,088 B2

## I. BACKGROUND

Liberty Mutual Insurance Company ("Liberty") filed a petition on September 28, 2012, requesting a covered business method patent review of U.S. Patent No. 7,124,088 B2 ("the '088 patent") pursuant to section 18(a) of the Leahy-Smith America Invents Act ("AIA").[1]  Paper 1 ("Pet."). Progressive Casualty Insurance Company ("Progressive") timely filed a patent owner preliminary response.  Paper 13 ("Prelim. Resp.").  Taking into account Progressive's preliminary response, the Board determined that the information presented in Liberty's petition demonstrates that, it was more likely than not, the challenged claims are unpatentable under 35 U.S.C. § 103(a).  Pursuant to 35 U.S.C. § 324, the Board instituted this proceeding on February 25, 2013, as to claims 1-46 of the '088 patent.  Paper 16 ("Dec.").

During this proceeding, Progressive timely filed a patent owner response (Paper 28, "PO Resp."), and Liberty timely filed a corrected reply to the patent owner response (Paper 41, "Reply").  A consolidated oral hearing was held on October 28, 2013.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This decision is a final written decision under 35 U.S.C. § 328(a) as to the patentability of

---

[1] Pub. L. No. 112-29, 125 Stat. 284, 329 (2011).

[2] The oral arguments for this proceeding and for CBM2013-00002, which is directed to U.S. Patent No. 7,877,269 B2 ("the '269 patent"), were merged and conducted at the same time.  A transcript of the oral hearing is included in the record as Paper 58.

2

Case CBM2012-00010
Patent 7,124,088 B2

the challenged claims. Based on the record before us, Liberty has
demonstrated, by a preponderance of the evidence, that claims 1-46 of
the '088 patent are unpatentable.

*A. The Invention of the '088 Patent*

The invention of the '088 patent generally relates to an insurance
data communication and processing system. Ex. 1001, 1:6-14. The
insurance data processing system allows a policyholder to access, view, and
update insurance policy information via the Internet. Ex. 1001, 2:58-61.
After the policyholder is authenticated, the system retrieves and displays the
information requested by the policyholder. Ex. 1001, 2:62-65. The system
employs a user-interface that guides the policyholder through various
activities. Ex. 1001, 2:65-67. Those activities include, but are not limited
to, the following: (1) reviewing billing information; (2) making a payment
via a credit card or online check; (3) reviewing policy information;
(4) reviewing state specific contract information; (5) quoting and
endorsement for vehicle replacement; (6) making address changes; and (7)
reviewing claim information. Ex. 1001, 2:65-3:4. The system displays both
the premium amount and variance, and updates the file of the policyholder at
their request, without the need for personal handling by an individual
representative of the insurer or an independent agent. Ex. 1001, 3:4-8.

Figure 2, which is reproduced below, illustrates a block diagram that
identifies the principal processing modules of the insurance data processing
system. Ex. 1001, 2:43-44.

3

Case CBM2012-00010
Patent 7,124,088 B2



FIG. 2

As shown in Figure 2 of the '088 patent, the insurance data processing system is segregated into four critical areas of content: (1) policy information 30, (2) policy changes 32, (3) policy quotes 34, and (4) claims information 36. Ex. 1001, 5:41-47. A prospective user can navigate to each module from Personal Progressive main menu 38 by accessing webpages that specifically are designed to guide the policyholder to the desired information via clicks on alternative query marks or via input of necessary information. Ex. 1001, 5:47-52. Figure 2 also illustrates module 37 that provides the policyholder with the ability to acquire online forms that typically include duplicate insurance forms, such as identification cards and declaration page sets. Ex. 1001, 5:57-60.

4

**A5003**

Case CBM2012-00010
Patent 7,124,088 B2

### B.  *Illustrative Claim*

Claim 1 is the only independent claim.  Claims 2-46 depend directly
or indirectly from independent claim 1.  Independent claim 1 is illustrative
of the invention of the '088 patent and reproduced below:

> 1.    An on-line insurance policy service system
> comprising:
>
> a web browser for accessing remote insurance
> information by an insurance policyholder and software linked
> to the remote insurance information;
>
> a publicly accessible distributed network for transferring
> data from the web browser;
>
> an information module, remote from the web browser
> coupled to the publicly accessible distributed network, that
> identifies the insurance policyholder and verifies an insurance
> policy parameter of an existing insurance policy of the
> insurance policyholder in real-time in response to first data
> received from the insurance policyholder through the publicly
> accessible distributed network and the web browser;
>
> where the first data comprises a personal security code
> that allows access to insurance policy parameters of the
> insurance policyholder;
>
> *an insurance policy adjustment module, remote from the*
> *web browser coupled to the publicly accessible distributed*
> *network, that adjusts the insurance policyholder's insurance*
> *policy parameter in real-time in response to second data*
> *received from the insurance policyholder through the publicly*
> *accessible distributed network and the web browser,*
>
> where the second data comprises a selection of the
> insurance policy parameter;
>
> where the insurance policy adjustment module provides
> an acknowledgement to the web browser in response to the

5

**A5004**

adjustment of the selected insurance policy parameter within the existing insurance policy, and implements the adjustment to the existing insurance policy; and

where an insurer's computer generates an insurance document customized to the insurance policyholder as identified by the personal security code and sends the customized insurance document to the web browser in response to the second data received from the insurance policyholder through the publicly accessible distributed network and the web browser.

Ex. 1001, 9:6-44 (emphasis added).

### C. Related Proceeding

Liberty indicates that the '088 patent was asserted against it in Case No. 1:11-cv-00082, *Progressive Cas. Ins. Co. v. Allstate Ins. Co. et al.*, which is currently pending in the United States District Court for the Northern District of Ohio. Pet. 5. The '269 patent is a continuation of the '088 patent. The '269 patent is subject to a covered business method patent review in *Liberty Mutual Insurance Co. v. Progressive Casualty Insurance, Co.*, CBM2013-00002. A final written decision in CBM2013-00002 is entered concurrently with this decision.

### D. Covered Business Method Patent

Upon consideration of Liberty's contentions submitted in its petition, as well as Progressive's arguments submitted in its patent owner preliminary response, the Board determined that the '088 patent is a covered business method patent, as defined in section 18(a)(1)(E) of the AIA and 37 C.F.R. § 42.301, because at least one claim of the '088 patent is directed to a covered business method. Dec. 6-11. Consequently, the Board concluded

6

Case CBM2012-00010
Patent 7,124,088 B2

that the '088 patent is eligible for a covered business method patent review.
*Id.* In its patent owner response, Progressive did not contest the Board's
conclusion that the '088 patent is eligible for a covered business method
patent review. Therefore, there is no dispute as to whether the Board has the
authority to institute a covered business method patent review as to claims 1-
46 of the '088 patent.

### E. Prior Art Relied Upon

Liberty relies upon the following prior art references:

Lockwood   US 4,567,359          Jan. 28, 1986          Ex. 1008

*Marketing of Insurance Over the Internet*, National Association of
Insurance Commissioners (1998) ("NAIC") (Ex. 1007).

### F. Grounds of Unpatentability

The Board instituted this proceeding based on the grounds of
unpatentability set forth in the table below.

| Claims | Basis | Reference(s) |
|---|---|---|
| 1-8, 12-41, and 44-46 | § 103(a) | NAIC |
| 4-11, 42, and 43 | § 103(a) | NAIC and Lockwood |

## II. ANALYSIS

### A. Claim Construction

In a covered business method patent review, claim terms are given
their broadest reasonable interpretation in light of the specification of the

7

**A5006**

Case CBM2012-00010
Patent 7,124,088 B2

patent in which they appear. 37 C.F.R. § 42.300(b). Under the broadest
reasonable interpretation standard, claims terms are given their ordinary and
customary meaning as would be understood by one of ordinary skill in the
art in the context of the entire disclosure. *In re Translogic Tech. Inc.*, 504
F.3d 1249, 1257 (Fed. Cir. 2007). We must be careful not to read limitations
from a particular embodiment appearing in the specification into the claim if
the claim language is broader than that embodiment. *In re Van Geuns*, 988
F.2d 1181, 1184 (Fed. Cir. 1993). If a feature in the disclosure is not
necessary to give meaning to what the inventor means by a claim term, it
would be "extraneous" and should not be read into the claim. *Renishaw
PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998);
*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430,
1433 (Fed. Cir. 1988).

Liberty initially identified seven claim terms and provided a claim
construction for those terms. Pet. 11-14. Those claim terms are listed as
follows: (1) "accessing remote insurance information by an insurance
policyholder;" (2) "information module," "insurance policy adjustment
module," "payment module," "payment enablement module," "claims
information module," and "policy quote(s) module;" (3) "insurance policy
parameter;" (4) "real-time;" (5) "personal security code;" (6) "adjustment;"
and (7) "insurance document." *Id.* In the decision on institution, the Board
construed each claim term identified by Liberty. Dec. 16-21. In its patent
owner response, Progressive proposed alternative claim constructions for the
following claim terms: (1) "real-time;" and (2) "insurance policy

8

**A5007**

Case CBM2012-00010
Patent 7,124,088 B2

parameter." PO Resp. 4-7. We will address each claim term identified by
Progressive in turn.

### 1. "real-time"

Independent claim 1 recites "an insurance policy adjustment module
. . . that adjusts the insurance policyholder's insurance policy parameter in
*real-time* in response to second data received from the insurance
policyholder through the publicly accessible distributed network and the web
browser." Emphasis added. In the decision on institution, the Board
construed the claim term "real-time" based on the definition of real-time in
The IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed.
1996). Dec. 19-20. The Board construed the claim term "real-time" as
"pertaining to a system or mode of operation in which computation is
performed during the actual time that an external process occurs, in order
that the computation results can be used to control, monitor, or respond in a
timely manner to the external process. *Contrast*: batch. *See also*:
conversational; interactive; interrupt; on-line." *Id.* (quoting The IEEE
Standard Dictionary of Electrical and Electronics Terms (6th ed. 1996)).

In its patent owner response, Progressive contends that the Board's
construction of the claim term "real-time" should be understood from the
perspective of one with ordinary skill in the art in the context of the specific
Internet web-based technology disclosed in the '088 patent. PO Resp. 5.
Progressive argues that, in the Internet web-based systems of the '088
patent, one with ordinary skill in the art would have understood that the
"external process" recited in the IEEE definition of "real-time" should be

9

Case CBM2012-00010
Patent 7,124,088 B2

limited to adjusting an insurance policy parameter during the same online
Internet session that resulted in receipt of the second data from the insurance
policyholder. *Id.* at 5-6 (citing Ex. 1001, 1:6-18, 46-53, 1:57-2:5, 2:58-3:8,
fig. 3). We do not agree with Progressive.

Upon reviewing the portions of the specification of the '088 patent
cited by Progressive in its patent owner response, there is no suggestion that
the claim term "real-time" limits the functionality of the disclosed online
computer system to adjusting an insurance policy parameter during the same
online Internet session that resulted in receipt of the second data from the
insurance policyholder. In other words, Progressive attempts to import
limitations into the claims by constructing the claim term "real-time" in a
way that is not supported by the specification of the '088 patent. We decline
to adopt such a construction as the broadest reasonable interpretation, as it
would import extraneous limitations into the claims, and it would be
inconsistent with the specification of the '088 patent. The use of the term
"same online Internet session" is not necessary to give meaning to the claim
term "real-time," and such a limitation should not be read into the claims
that recite this feature. *Renishaw*, 158 F.3d at 1249.

Moreover, it is unclear to us what constitutes the same online Internet
session. For instance, the same online Internet session may include logging
on to a computer at the beginning of a day, which, in turn, accesses the
Internet, visiting a number of webpages throughout the day, and logging off
the computer at the end of the day. Alternatively, the same online Internet
session may include accessing the Internet via a computer, opening a

10

**A5009**

Case CBM2012-00010
Patent 7,124,088 B2

webpage in a window, and closing that window. The uncertainty regarding
what constitutes the same online Internet session would inject ambiguity into
the claim construction for the claim term "real-time."

Therefore, we maintain that, in light of the specification of the '088
patent, the broadest reasonable interpretation of the claim term "real-time,"
is "pertaining to a system or mode of operation in which computation is
performed during the actual time that an external process occurs, in order
that the computation results can be used to control, monitor, or respond in a
timely manner to the external process. *Contrast*: batch. *See also*:
conversational; interactive; interrupt; on-line." The IEEE Standard
Dictionary of Electrical and Electronics Terms (6th ed. 1996).

2. *"insurance policy parameter"*

Independent claim 1 recites "an information module . . . [that]
verifies an insurance policy parameter of an existing insurance policy of the
insurance policyholder." Liberty construes the clam term "insurance policy
parameter" as "any information relating to an insurance policy." Pet. 13
(citing Ex. 1001, 2:11-17, 3:31-4:42). In its patent owner preliminary
response, Progressive did not challenge Liberty's claim construction for that
claim term. However, in its patent owner response, Progressive contends
that Liberty's claim construction for the claim term "insurance policy
parameter" is unreasonable because it ignores the interpretative guidance
provided in the specification of the '088 patent, and does not reflect the
understanding of a person with ordinary skill in the art. PO Resp. 6.
Progressive argues that Liberty's claim construction is unreasonable to the

11

**A5010**

Case CBM2012-00010
Patent 7,124,088 B2

extent that the words "any" and "relating" allow the construction to
encompass information that in some way "relates" to the insurance policy,
but is not a material parameter of the policy itself. *Id.* Therefore,
Progressive asserts that the proper claim construction for the claim term
"insurance policy parameter" is "information material to an insurance
policy." *Id.* at 6-7 (citing Ex. 1001, 1:31-36, 2:11-17, 8:14-20). We do not
agree with Progressive.

    The portions of the specification of the '088 patent cited by
Progressive in its patent owner response only provide examples of the claim
term "insurance policy parameter," and do not limit that claim term to
information that is material to an insurance policy. In other words,
Progressive attempts to import limitations from the specification into the
claims by construing the claim term "insurance policy parameter" in a way
that is not supported by the specification of the '088 patent. We decline to
adopt such a construction as the broadest reasonable interpretation, as it
would import extraneous limitations into the claims, and it would be
inconsistent with the specification of the '088 patent. The use of the term
"material" is not necessary to give meaning to the claim term "insurance
policy parameter," and such a limitation should not be read into the claims
that recite this feature. *Renishaw*, 158 F.3d at 1249.

    Moreover, Progressive does not explain adequately what constitutes a
material parameter of an insurance policy. For instance, material parameters
of an insurance policy may be limited to the name of the insurer and the item
to be insured. Alternatively, material parameters of an insurance policy may

12

**A5011**

Case CBM2012-00010
Patent 7,124,088 B2

not be so limited and include each of the examples of an insurance policy parameter listed in the specification of the '088 patent, i.e., residence of the insurer, vehicle location, number of household drivers, addition of a new vehicle or replacement of an old vehicle, and changes in insurance coverage, deductible amounts, or policy limits. The uncertainty regarding what constitutes a material parameter of an insurance policy would inject ambiguity into the claim construction for the claim term "insurance policy parameter."

We also disagree with how Liberty construed the claim term "insurance policy parameter" because any information relating to an insurance policy is overly broad. Upon reviewing the specification of the '088 patent, we do not find an explicit or special definition for the claim term "parameter." The Oxford Desk Dictionary and Thesaurus, American Edition (1997), defines a "parameter" as "a characteristic or feature." Based on that dictionary definition, the claimed "parameter" is not merely any information relating to an insurance policy, but rather a characteristic or feature of an insurance policy.

Therefore, the ordinary and customary meaning of the claim term "insurance policy parameter," as would be understood by one with ordinary skill in the art in light of the specification of the '088 patent, is "a characteristic or feature of an insurance policy." This claim construction is consistent with the examples of an insurance policy parameter listed in the specification of the '088 patent. *See, e.g.*, Ex. 1001, Ex. 1001, 1:31-36, 2:11-17, 8:14-20.

13

**A5012**

Case CBM2012-00010
Patent 7,124,088 B2

### B. The Level of Ordinary Skill in the Art

In determining the level of one with ordinary skill in the art, we note that various factors may be considered, including "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citing *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,* 807 F.2d 955, 962 (Fed. Cir. 1986)). As explained in the decision on institution (Dec. 24), NAIC is a white paper or an authoritative report or guide, which, by itself, reflects the appropriate skill level in the art of insurance (Ex. 1007, p. 1[3]). *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

There is additional evidence in the record before us that reflects the knowledge level of a person with ordinary skill in the art. We note that such an artisan possesses ordinary skill in the art of insurance and, in particular, adjusting new or existing insurance policies. Ex. 1009 ¶ 12; Ex. 1016 ¶ 19; Ex. 2202 ¶ 10; Ex. 2204 ¶¶ 21, 23. With respect to the insurance aspects of the invention in the '088 patent, Liberty's expert, Ms. Mary L. O'Neil, asserts that a person of ordinary skill in the art would be an individual with at least 5 years of experience in actuarial and management aspects of the insurance industry, including policy rating, underwriting, claims, policy adjustments, and related computer systems. Ex. 1016 ¶ 19. Progressive's

---

[3] All references to the page numbers in NAIC refer to the page numbers located at the bottom, middle of each page.

14

Case CBM2012-00010
Patent 7,124,088 B2

expert, Ms. Ruth Ann Cacchione, asserts that a person of ordinary skill in the art would be an individual with at least 2-3 years of field and 2-3 years of home office experience in rating, underwriting, and servicing existing insurance policies. Ex. 2204 ¶ 23. With respect to the computer aspects of the invention in the '088 patent, the experts for each party agree that a person of ordinary skill in the art would be an individual with a computer science degree, or equivalent, and at least 2-3 years of experience in designing, developing, and maintaining computer systems via the Internet. Ex. 1009 ¶ 12; Ex. 2202 ¶ 10.

### C. Principles of Law

A patent claim is unpatentable under § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

We analyze the two grounds of unpatentability on which this proceeding was instituted with the aforementioned principles in mind. We also recognize that prior art references must be "considered together with the

15

**A5014**

Case CBM2012-00010
Patent 7,124,088 B2

knowledge of one of ordinary skill in the pertinent art." *In re Paulsen*, 30
F.3d 1475, 1480 (Fed. Cir. 1994). Moreover, "it is proper to take into
account not only specific teachings of the references but also the inferences
which one skilled in the art would reasonably be expected to draw
therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). That is because
an obviousness analysis "need not seek out precise teachings directed to the
specific subject matter of the challenged claim, for a court can take account
of the inferences and creative steps that a person of ordinary skill in the art
would employ." *KSR*, 550 U.S. at 418; *Translogic Tech.*, 504 F.3d at 1259.

### D. Claims 1-8, 12-41, and 44-46

Liberty contends that claims 1-8, 12-41, and 44-46 are unpatentable
under § 103(a) over NAIC. Pet. 15-44. In support of that alleged ground of
unpatentability, Liberty provides explanations as to how NAIC teaches each
claim limitation. *Id.* Liberty also submits declarations of Mr. David
Klausner (Ex. 1009) and Ms. Mary L. O'Neil (Ex. 1016) to support its
positions. Upon reviewing Liberty's petition and supporting evidence, as
well as Progressive's response and supporting evidence, we determine that
Liberty has demonstrated, by a preponderance of the evidence, that claims 1-
8, 12-41 and 44-46 are unpatentable over NAIC.

We begin our analysis with a general discussion of NAIC, and then
we turn to the arguments presented by both Liberty and Progressive that are
directed towards whether NAIC teaches the following claim limitation
recited in independent claim 1:

16

**A5015**

Case CBM2012-00010
Patent 7,124,088 B2

> *an insurance policy adjustment module*, remote from the web
> browser coupled to the publicly accessible distributed network,
> that adjusts the insurance policyholder's insurance policy
> parameter in *real-time* in response to second data received from
> the insurance policyholder through the publicly accessible
> distributed network and the web browser.

Ex. 1001, 9:23-29 (emphasis added).

### *1. NAIC*

NAIC provides a detailed discussion of the Internet as it relates to insurance transactions, possible transactional guidelines, and other issues relating to online insurance transactions. Ex. 1007, p. 1. According to NAIC, the Internet provides email and home page capabilities that allow a prospective consumer to communicate with insurance companies about changes to their respective insurance policies. Ex. 1007, pp. 4, 9. The Internet also provides instantaneous confirmation that an insurance company has complied with a consumer's instruction(s). *Id.* In addition, NAIC discloses that by establishing websites on the Internet, insurance companies have the ability to conduct instant transactions and communications. Ex.1007, pp. 8, 20. A typical insurance consumer interacts with an insurance company on at least four occasions: (1) when the insurance is purchased; (2) when the insurance premium is paid; (3) when a claim is made on the policy; and (4) when changes to coverage or a beneficiary are made. Ex. 1007, p. 9.

NAIC discloses that automation vendors design websites that are integrated with agency management systems. Ex. 1007, p. 17. Those

17

**A5016**

Case CBM2012-00010
Patent 7,124,088 B2

websites permit policyholders to access their insurance companies
electronically to examine billing status, determine the type and amount of
coverage, make changes to their policy, request quotes, and obtain
information about other types of insurance coverage. *Id.* According to
NAIC, the insurance industry views those websites as an opportunity to
operate an insurance agency that is accessible to policyholders and
consumers 24 hours a day. *Id.*

### 2. *Contentions*

In its petition, Liberty contends that the NAIC teaches the claimed
"insurance policy adjustment module" feature and corresponding "real-time"
adjustment aspect required by independent claim 1. Pet. 19-20 (citing Ex.
1007, pp. 4, 9, 17, 20, p. 2 of App. A, p. 2 of App. B.) In the decision on
institution, the Board only referenced pages 4, 8, 9, and 20 of NAIC before
determining that Liberty met its burden of demonstrating that the disputed
claim limitation is, more likely than not, unpatentable over NAIC. Dec. 23.

In its patent owner response, Progressive presents a number of
arguments that allegedly explain why each of the textual portions of NAIC
that was relied upon by Liberty in the petition do not teach the claimed
"insurance policy adjustment module" feature and corresponding "real-time"
adjustment aspect required by independent claim 1. PO Resp. 8-45. For the
reasons stated below, we do not agree with Progressive. In particular, our
analysis focuses on Progressive's arguments directed to pages 8 and 9 of
NAIC, and how those textual portions of NAIC, as a whole, would have
taught the disputed claim limitation to one with ordinary skill in the art.

18

**A5017**

Case CBM2012-00010
Patent 7,124,088 B2

### a. Progressive's Contentions Directed to Page 8 of NAIC

In its patent owner response, Progressive contends that one with ordinary skill in the art would not have understood that NAIC's disclosure at page 8, which pertains to "instant transactions and communications," teaches the claimed "insurance policy adjustment module" feature and corresponding "real-time" adjustment aspect required by independent claim 1. PO Resp. 26-27 (citing Ex. 2202 ¶ 29; Ex. 2204 ¶ 44-45). In its reply, Liberty contends that NAIC discloses using technology that existed in 1998 to adjust insurance policy parameters in real-time, as well as automated processing of insurance transactions via the Internet. Reply 2-7, 11-15. Liberty also submits a rebuttal declaration of Mr. Klausner (Ex. 1024) to support its positions.

Progressive's argument and the corresponding testimony of Ms. Cacchione narrowly focuses on the traditional procedures for adjusting insurance policy parameters and, in particular, the instantaneous nature of the communications submitted via the Internet, but fails to discuss NAIC's disclosure as a whole. A prior art reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it is describing and attempting to protect. *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985). Neither Progressive, nor its experts, address NAIC's disclosure regarding the advantages associated with conducting insurance services via the Internet. Reply 2-4 (citing Ex. 1007, p. 13 ("[C]onsumers currently have the ability from at least one auto insurer to complete the entire transaction on-line.");

19

Case CBM2012-00010
Patent 7,124,088 B2

Ex. 1007, p. 14 ("Consumers already have the ability from at least one
company to review their account status to determine when and how much
they need to pay to maintain their existing policy. . . . This service
eliminates the two step process of calling the company to find out how much
is owed and then mailing a payment")). Given these textual portions of
NAIC, one with ordinary skill in the art would have recognized that the
"instant transactions and communications" disclosed on page 8 of NAIC are
not limited to traditional procedures for adjusting insurance policy
parameters, e.g., receiving and processing emails from an insurer manually.
Instead, one with ordinary skill in the art would have recognized that such
"instant transactions and communications" refer to an insurance service that
allows a prospective insurer to conduct an entire transaction via the Internet.

Next, Progressive contends that the claimed "insurance policy
adjustment module" feature and corresponding "real-time" adjustment
aspect required by independent claim 1 does not flow necessarily from
NAIC's disclosure of "instant transactions and communications." PO Resp.
27-28. Rather, Progressive asserts that NAIC's disclosure of "instant
transactions and communications" could refer to types of transactions or
communications other than adjusting insurance policy parameters in real-
time. *Id.* at 28 (citing Ex. 1007, pp. 7, 20).

Progressive's argument is unpersuasive. Progressive fails to
recognize that NAIC discloses that a typical insurance consumer interacts
with an insurance company on four occasions, one of which includes
changing coverage or beneficiaries to its respective insurance policy.

20

**A5019**

Case CBM2012-00010
Patent 7,124,088 B2

Ex. 1007, p. 9. Liberty's expert, Mr. Klausner, attests that one with ordinary skill in the art would have recognized that NAIC's disclosure of changing coverage or beneficiaries to a respective insurance policy amounts to adjusting an insurance policy parameter. *See* Ex. 1009 ¶ 28; Ex. 1024 ¶ 7. Therefore, contrary to Progressive's argument, NAIC's disclosure of "instant transactions and communications" is not limited merely to instant transactions, such as obtaining a quote for a new insurance policy or communicating information to the insurance company, but instead encompasses instantaneously adjusting an insurance policy parameter.

   *b. Progressive's Contentions Directed to Page 9 of NAIC*

   In its patent owner response, Progressive contends that NAIC's disclosure at page 9, which pertains to typical insurance consumer interactions with an insurance company, such as changing coverage or beneficiaries, does not teach the claimed "insurance policy adjustment module" feature and corresponding "real-time" adjustment aspect required by independent claim 1. PO Resp. 29-31 (citing Ex. 2202 ¶ 28, Ex. 2204 ¶ 47). In its reply, Liberty contends that NAIC discloses using technology that existed in 1998 to adjust insurance policy parameters in real-time, and asserts that insurance computer systems in 1998 had progressed far beyond an Internet email front-end to traditional manual processing. Reply 2-11. Liberty also submits the rebuttal declaration of Mr. Klausner (Ex. 1024) to support its positions.

   We are not persuaded by Progressive's argument that NAIC's disclosure at page 9 does not teach adjusting an insurance policy parameter.

21

**A5020**

Case CBM2012-00010
Patent 7,124,088 B2

Progressive's argument narrowly focuses on NAIC's disclosure of
processing claims, complaints, and insurance policyholder services, and the
alleged lack of a "real-time" connection between an insurance consumer and
company.  However, Progressive fails to recognize that NAIC discloses
typical interactions between an insurance consumer and company, including
changing coverage or beneficiaries to its respective insurance policy.
Ex. 1007, p. 9.  Although NAIC's disclosure at page 9 does not indicate
explicitly that changing coverage or beneficiaries to a respective insurance
policy occurs in "real-time," one with ordinary skill in the art would have
appreciated that such transactions may be "instant" in nature  *See* Ex. 1009
¶ 28; Ex. 1024 ¶ 7 (citing Ex. 1007, p. 8).

  Next, Progressive contends NAIC's disclosure of the Internet at
page 9 merely implies email communications between an insurance
consumer and the agent/representative of an insurance company and,
therefore, does not teach the disputed claim limitation.  PO Resp. 31 (citing
Ex. 1007, p. 2 of App. E, p. 29).  As noted above, Progressive fails to
discuss NAIC's disclosure as a whole.  Neither Progressive, nor its experts,
address NAIC's disclosure regarding the advantages associated with
conducting insurance services via the Internet (*see, e.g.*, Ex. 1007, pp. 13-
14), which are not limited to email communication between an insurance
consumer and the agent/representative of an insurance company, but rather
are applicable to providing an insurance service that allows a prospective
insurer to conduct an entire transaction via the Internet.

22

**A5021**

Case CBM2012-00010
Patent 7,124,088 B2

### c. *NAIC Must be Read as a Whole*

Progressive contends that any one passage from NAIC is not helpful
to supplement any other passage from NAIC because each individual
passage relied upon by Liberty in the petition fails to teach the claimed
"insurance policy adjustment module" feature and corresponding "real-time"
adjustment aspect required by independent claim 1. PO Resp. 45. We do
not agree with Progressive. NAIC must be considered for everything it
teaches by way of technology and is not limited to the particular invention it
is describing and attempting to protect. *EWP Corp.*, 755 F.2d at 907. NAIC
also must be considered together with the knowledge of one with ordinary
skill in the art. *Paulsen*, 30 F.3d at 1480. Such analysis includes reading
NAIC in context, taking into account "demands know to the design
community," "the background knowledge possessed by a person having
ordinary skill in the art," and "the inferences and creative steps that a person
of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418. Reading
individual passages from NAIC in isolation would be contrary to these
principles.

### d. *Summary*

In summary, we broadly, but reasonably, construe the claim term
"real-time" as "pertaining to a system or mode of operation in which
computation is performed during the actual time that an external process
occurs, in order that the computation results can be used to control, monitor,
or respond in a timely manner to the external process. *Contrast*: batch. *See
also*: conversational; interactive; interrupt; on-line." Consistent with that

23

**A5022**

Case CBM2012-00010
Patent 7,124,088 B2

claim construction, we conclude that NAIC, as a whole, would have taught one with ordinary skill in the art an instantaneous adjustment of an insurance policy parameter that reflects a mode of operation in which action is performed during the actual time that the adjustment is requested, such that the results are timely with respect to the adjustment. Therefore, we are not persuaded by Progressive's argument that one of ordinary skill in the art would not have understood that NAIC teaches the claimed "insurance policy adjustment module" feature and corresponding "real-time" adjustment aspect required by independent claim 1.

### 3. Whether the Disclosure of NAIC is Non-Enabling

Progressive contends that NAIC does not enable one with ordinary skill in the art to make the invention of the '088 patent. PO Resp. 48-52. Progressive presents a number of arguments that are predicated on the notion that NAIC's disclosure does not provide any implementation details that make the invention of the '088 patent predictable, much less provide any reasonable expectation of success. *Id.* In its reply, Liberty contends that Progressive's argument that NAIC speculates about functionality that eventually could be developed in the future lacks merit. Reply 1. Liberty maintains that NAIC discloses that insurers are using "sophisticated, interactive Web sites"—not merely email—to conduct insurance transactions, including selling, servicing and modifying existing policies. *Id.* (citing Ex. 1007, pp. 1, 7-9, 13, 14, 17; Ex. 1024 ¶ 7-8; *see* Ex. 1009 ¶¶ 26-28.)

24

**A5023**

Case CBM2012-00010
Patent 7,124,088 B2

As explained previously, NAIC discloses that consumers, as of 1998, had the ability from at least one insurance company to complete an entire transaction via the Internet. Ex. 1007, p. 13. Contrary to Progressive's argument, NAIC does not speculate about developing and implementing a website to conduct insurance transactions, it, in fact, discloses that, as of 1998, an insurance company already is using a website to complete an entire transaction via the Internet. Even if we presume that NAIC speculates about the functionality associated with developing and implementing a website to conduct insurance transactions, it is well settled that published subject matter is prior art for all that it teaches in obviousness determinations—even if the reference itself is not enabling. *See In re Antor Media Corp.*, 689 F.3d 1282, 1292 (Fed. Cir. 2012) (citing *Symbol Techs. Inc. v. Opticon Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991) ("[A] non-enabling reference may qualify as prior art for the purpose of determining obviousness under § 103.")). For those reasons alone, we are not persuaded by Progressive's arguments regarding the alleged non-enabling disclosure of NAIC.

In any event, we note that prior art publications are presumed to be enabled. *Antor*, 689 F.3d at 1287-88; *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003). Once specific, concrete reasons as to why the cited prior art reference is not enabling have been identified, however, we conduct an analysis by reviewing the argument and supporting evidence to determine whether the prior art is enabling. *Antor*, 689 F.3d at 1292; *see also In re Morsa*, 713 F.3d 104, 110 (Fed. Cir. 2013).

25

**A5024**

Case CBM2012-00010
Patent 7,124,088 B2

Here, Progressive fails to demonstrate that NAIC does not provide an enabling disclosure for the claimed "insurance policy adjustment module" feature and corresponding "real-time" adjustment aspect required by independent claim 1. In particular, Progressive does not provide sufficient factual basis to support a showing that, based on NAIC's disclosure, undue experimentation would be needed to practice the disputed claim limitation. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). For this additional reason, we are not persuaded by Progressive's arguments regarding the alleged non-enabling disclosure of NAIC.

### 4. Conclusion

For the foregoing reasons, we conclude that Liberty has demonstrated, by a preponderance of the evidence, that independent claim 1 of the '088 patent is unpatentable over NAIC. Progressive relies upon the same arguments presented against independent claim 1 to rebut the explanations provided by Liberty as to how NAIC teaches the claimed limitations recited in dependent claims 2-8, 12-41 and 44-46. PO Resp. 7-52. Therefore, for the same reasons discussed above with respect to independent claim 1, we conclude that Liberty has demonstrated, by a preponderance of the evidence, that dependent claims 2-8, 12-41 and 44-46 of the '088 patent are unpatentable over NAIC.

26

**A5025**

Case CBM2012-00010
Patent 7,124,088 B2

### E. Claims 4-11, 42, and 43

Liberty contends that claims 4-11, 42, and 43 are unpatentable under § 103(a) over the combination of NAIC and Lockwood. Pet. 37-44. In support of that alleged ground of unpatentability, Liberty provides explanations as to how the combination of NAIC and Lockwood teaches each claim limitation. *Id.* Liberty also submits declarations of Mr. Klausner (Ex. 1009) and Ms. O'Neil (Ex. 1016) to support its positions. Upon reviewing Liberty's petition and supporting evidence, as well as Progressive's response and supporting evidence, we determine that Liberty has demonstrated, by a preponderance of the evidence, that claims 4-11, 42, and 43 are unpatentable over the combination of NAIC and Lockwood.

We begin our analysis with a general discussion of Lockwood, and then we turn to the arguments presented by both Liberty and Progressive that are directed towards whether the Lockwood teaches the claim limitations recited in claims 4-11, 42, and 43.

### 1. Lockwood

Lockwood generally relates to a system for automatically dispensing information, services, and products to customers in a self-service fashion. Ex. 1008, 1:6-8. In particular, Lockwood discloses that the system may be used to dispense insurance quotations and policies automatically. Ex. 1008, 1:8-10. Figure 1 of Lockwood, which is reproduced below, illustrates data processing center 1, which includes central processing unit 22 and memory 23. Ex. 1008, 5:37-38.

27

**A5026**

Case CBM2012-00010
Patent 7,124,088 B2



FIG. 1.

As shown in Figure 1, Lockwood discloses that processing unit 22 operates in response to program instructions to perform insurance quotation calculations based on customer information received from a terminal. Ex. 1008, 3:51-55, 5:44-49, 6:3-14. Lockwood further discloses that all operations with respect to obtaining information, checking credit, transmitting information to respective companies, and issuing policies are carried out automatically. Ex. 1008, 9:16-20.

### 2. Contentions

In its patent owner response, Progressive contends that Liberty only provides explanations as to how Lockwood teaches the claim limitations recited in dependent claims 4-11, 42, and 43, and does not explain how Lockwood remedies the above-noted deficiencies in NAIC for the claim limitations recited in independent claim 1. PO Resp. 52. As explained previously, there are no such deficiencies in NAIC for Lockwood to cure.

28

**A5027**

Case CBM2012-00010
Patent 7,124,088 B2

### a. Claims 9-11, 42, and 43

Next, Progressive presents separate arguments directed to dependent claims 9-11, 42, and 43. PO Resp. 52-56. For the reasons stated below, we do not agree with Progressive. In particular, our analysis focuses on how the textual portions of Lockwood relied upon by the Liberty do not preclude communicating price adjustments associated with changing a parameter of an existing insurance policy, as required by dependent claims 9 and 42.

In its petition, Liberty contends that Lockwood describes claim 9, which recites that "the acknowledgement comprises a price of the adjustment to the selected insurance policy parameter." Pet. 41-42 (citing Ex. 1008, 5:44-6:16). Liberty further argues that the combination of NAIC and Lockwood teaches claim 42, which recites the following:

> where the insurance policy adjustment module is further configured to generate in real-time an insurance policy cost adjustment attributable to the adjustment of the insurance policyholder's insurance policy parameter, and where the insurance policy adjustment module is also further configured to communicate the insurance policy cost adjustment in real-time in the customized insurance document sent to the insurance policyholder over the publicly accessible distributed network.

*Id.* at 43 (citing Ex. 1007, pp. 4, 7-9, 11, 13-15, 17, 20, 25, App. A at 2, App. B at 2; Ex. 1008, 5:37-44, 5:66-6:21, figs. 1, 5).

In its patent owner response, Progressive contends that the "selected insurance policy parameter" recited in dependent claim 9 amounts to an insurance policy parameter for an existing insurance policy. PO Resp. 54.

29

Case CBM2012-00010
Patent 7,124,088 B2

Progressive argues that the insurance policy quotes communicated in Lockwood are quotes for new insurance policies and, therefore, Lockwood does not disclose communicating adjustments to existing insurance policies. *Id.* (citing Ex. 1008, Abstract, 2:8-19, 3:33-40, 4:64-66, 5:44-6:32). Progressive relies upon the same argument presented against dependent claim 9 to rebut the explanations provided by Liberty as to how Lockwood teaches the claimed limitation recited dependent claim 42. PO Resp. 55-56. In its reply, Liberty contends that Progressive ignores that issuing new policies and adjusting existing policies involve many identical functions. Reply 2-3, n. 5 (citing Ex. 1016 ¶¶ 19, 40).

We begin our analysis by noting that it is well settled that a person of ordinary skill is a person of ordinary creativity, not an automaton. *See KSR*, 550 U.S. at 421. Even if we presume that Lockwood is limited to communicating quotes to a consumer for a new insurance policy, Liberty, nonetheless, presents sufficient evidence indicating that one with ordinary skill in the art would have recognized that Lockwood's system possesses the capability to generate and communicate price adjustments associated with changing a parameter of an existing insurance policy. Ex. 1016 ¶ 40. In other words, communicating price adjustments associated with changing a parameter of an existing insurance policy, instead of communicating quotes for new insurance policies, predictably uses prior art elements according to their established functions—an obvious improvement. *See KSR*, 550 U.S. at 417. Moreover, Progressive does not present sufficient or credible evidence that communicating price adjustments associated with changing a parameter

30

Case CBM2012-00010
Patent 7,124,088 B2

of an existing insurance policy is beyond the level of an ordinary skill artisan. *See Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

For the foregoing reasons, we conclude that Liberty has demonstrated, by a preponderance of the evidence, that dependent claims 9 and 42 of the '088 patent arc unpatentable over the combination of NAIC and Lockwood. Progressive relies upon the same arguments presented against dependent claims 9 and 42 to rebut the explanations provided by Liberty as to how Lockwood teaches the claimed limitations recited in dependent 10, 11, and 43.  PO Resp. 54, 56-57.  Therefore, for the same reasons discussed above with respect to dependent claims 9 and 42, we conclude that Liberty has demonstrated, by a preponderance of the evidence, that dependent claims 10, 11, and 43 of the '088 patent are unpatentable over the combination of NAIC and Lockwood.

*F.  Whether Liberty's Declaration of Mr. David Klausner  (Ex. 1009) Should be Given No Weight*

In its patent owner response, Progressive contends that Mr. Klausner's testimony should be given no weight for the following reasons:  (1) he does not have the appropriate experience to qualify as an expert in the pertinent art; and (2) his résumé includes false information.  PO Resp. 57-65. Progressive's repeats the same arguments in its motion to exclude, which we address below.

31

**A5030**

Case CBM2012-00010
Patent 7,124,088 B2

### G. Progressive's Motion to Exclude Evidence

Progressive seeks to exclude the following evidence: (1) the declarations of Mr. David Klausner (Exs. 1009, 1024, and 1035) because he is not qualified to provide an opinion in this proceeding; (2) Exhibits 1023-1037 because they include impermissible hearsay; (3) Exhibits 1025-1034 and 1036 because they are not authenticated; and (4) Exhibits 1033 and 1034 because they are irrelevant and prejudicial. Paper 45 ("PO Mot.") Liberty opposes Progressive's motion to exclude. Paper 50 ("Pet. Opp."). In response, Progressive filed a reply to Liberty's opposition to its motion to exclude. Paper 52. For the reasons discussed below, Progressive's motion to exclude is denied.

### 1. Whether Mr. Klausner is Qualified to Provide an Opinion in This Proceeding

Progressive contends that the declarations of Mr. Klausner are not admissible because he is not qualified to provide an opinion in this proceeding under Federal Rule of Evidence ("Fed .R. Evid.") 702. [4]

--------

[4] Fed. R. Evid. 702. Testimony by Expert Witnesses
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
   (b) the testimony is based on sufficient facts or data;
   (c) the testimony is the product of reliable principles and methods; and
   (d) the expert has reliably applied the principles and methods to the facts of the case.

32

**A5031**

Case CBM2012-00010
Patent 7,124,088 B2

PO Mot. 3-9. Progressive's argument is predicated on the notion that the
field of the '088 patent is Internet web-based functionality, and Mr. Klausner
is not qualified to provide his opinion regarding that matter. *Id.* at 3-4. In
response, Liberty contends that Progressive improperly limits the field of the
'088 patent to the Internet. Pet. Opp. 3-4. We agree with Liberty.

As discussed previously, the field of the '088 patent generally relates
to an insurance data communication and processing system. Ex. 1001, 1:6-
14. Although independent claim 1 recites "a publicly accessible distributed
network for transferring data," there is nothing in the specification of the
'088 that limits the aforementioned claim feature to the Internet. For
instance, dependent claim 35 recites "where the publicly accessible
distributed network comprises the Internet." Applying the broadest
reasonable interpretation standard to independent claim 1, the "publicly
accessible distributed network for transferring data" recited therein is not
limited to the Internet. Therefore, contrary to Progressive's argument, not
all the claims of the '088 patent reference Internet web-based functionality
because the "publicly accessible distributed network for transferring data"
recited in independent 1 is not limited to the Internet.

Even if we presume that the field of the '088 patent is limited to the
Internet, the testimony of Progressive's own expert, Dr. Kevin Jeffay,
indicates that Mr. Klausner has the requisite experience to provide an expert
opinion on designing, developing, and maintaining computer systems via the
Internet. With respect to the computer aspects of the invention in the '088
patent, Dr. Jeffay testifies that a person of ordinary skill in the art would be

33

**A5032**

Case CBM2012-00010
Patent 7,124,088 B2

an individual with a computer science degree, or equivalent, and at least 2-3 years of experience in designing, developing, and maintaining computer systems via the Internet. Ex. 2202 ¶ 10. According to Mr. Klausner's curriculum vitae, he earned a Bachelor of Arts in Mathematics, as well as a Master of Science in Electrical Engineering. Ex. 1010 at 1. Mr. Klausner also designed a commercial online system for Intel from 1991-1993. *Id.* at 2. In addition, Mr. Klausner attests that he was involved in numerous matters relating to the Internet after 1993, such as Internet computing, software, web design, etc. Ex. 1024 ¶¶ 16-17. Therefore, based on qualifications outlined by Progressive's expert, Mr. Klausner is qualified to give expert testimony on the subjects of designing, developing, and maintaining computer systems via the Internet.

Next, Progressive questions the qualifications of Mr. Klausner as an expert because he allegedly provided false statements about his experience on his résumé. PO Mot. 9-11. In response, Liberty contends that Progressive's argument is unfounded. Pet. Opp. 9. Liberty argues that Progressive does not explain adequately why the declarations provided by Mr. Klausner are inadmissible. *Id.* We agree with Liberty. Mr. Klausner's curriculum vitae indicates that he was consulted as an expert in one hundred ninety four matters. Ex. 1010 at 5-24. Progressive's identification of two matters where Mr. Klausner's description of his duties was called into question does not render the additional one hundred ninety two matters irrelevant. Any such inconsistency simply would affect the weighing of the testimony offered by Mr. Klausner.

34

**A5033**

Case CBM2012-00010
Patent 7,124,088 B2

For the foregoing reasons, we decline to exclude the declarations of
Mr. David Klausner (Exs. 1009, 1024, and 1035).

    2. *Whether Exhibits 1023-1037 Should be Excluded as Hearsay*

Progressive contends that Exhibits 1023-1037 each include out of
court statements being offered for the truth of the matter asserted and,
therefore, should be excluded as hearsay under Federal Rule of Evidence
802.[5] PO Mot. 11-14. In response, Liberty contends that Exhibits 1023,
1024, 1035, and 1037 are rebuttal declarations containing testimony
rendered by four declarants in this proceeding and fall outside the scope of
impermissible hearsay. Pet. Opp. 9-10. Liberty argues that Exhibits 1025-
1034 and 1036 are articles that were considered by its expert, Mr. Klausner,
and confirm what one with ordinary skill in the art would have known about
technical features and development in the pertinent art. *Id.* at 10-11. Liberty
further argues that Exhibits 1025-1034 and 1036 are articles that are
admissible for the truth of the matter asserted under certain hearsay
exceptions. *Id.* at 11-13.

    With respect to the rebuttal declarations that are Exhibits 1023, 1024,
1035, and 1037, the testimony rendered by Mr. Darrell W. Stark,
Mr. Klausner, and Mr. Jordan M. Rossen are not out of court statements, as
they are direct rebuttal testimony submitted in this proceeding.

---

[5] Fed. R. Evid. 802. The Rule Against Hearsay
Hearsay is not admissible unless any of the following provides otherwise:
    (a) a federal statute;
    (b) these rules; or
    (c) other rules prescribed by the Supreme Court.

Case CBM2012-00010
Patent 7,124,088 B2

Progressive's argument that the Board's rules, as well as the Scheduling Order (Paper 17), do not provide it with an opportunity to cross-examine the rebuttal declarants is incorrect. PO Mot. 11-13. The opportunity to cross-examine rebuttal declarants is provided as routine discovery under 37 C.F.R. § 42.51(b)(1)(ii). Progressive cannot seek to exclude Liberty's rebuttal declarants on the basis that it chose neither to cross-examine them nor, if necessary, request the filing of observations on cross-examination.

With respect to the articles that are Exhibits 1025-1034 and 1036, we are not persuaded by Progressive's arguments that these exhibits constitute hearsay. Progressive does not identify specifically the textual portions of the aforementioned exhibits that allegedly are being offered for the truth of the matter asserted, yet seeks to exclude the entirety of each exhibit. We will not go through the entirety of each exhibit and determine which portion of the exhibit Progressive believes to be hearsay—this is something that Progressive should have done in its motion to exclude.

Moreover, we do not reach Liberty's argument that the articles that are Exhibits 1025-1034 and 1036 are admissible for the truth of the matter asserted under certain hearsay exceptions. Pet. Opp. 11-13. We have considered the statements therein not for the truth of the matter asserted, but for the fact that such statements were made at all. We recognize that these exhibits were relied on by Liberty's rebuttal declarant, Mr. Klausner, and are of the type that experts in the pertinent field reasonably would rely on to form their opinions. Accordingly, as argued by Liberty (*id.* at 10-11), these exhibits need not themselves be admissible for the testimony of Mr.

36

Case CBM2012-00010
Patent 7,124,088 B2

Klausner to be admissible. We further agree with Liberty that the articles
that are Exhibits 1025-1034 and 1036 serve a non-hearsay purpose for which
they can be admitted—namely to show what one with ordinary skill in the
art would have known about technical features and developments in the
pertinent art. *Id.* at 11.

For the foregoing reasons, we decline to exclude Exhibits 1023-1037
as impermissible hearsay.

### 3. *Whether Exhibits 1025-1034 and 1036 Should be Excluded as Unauthenticated Evidence*

Progressive contends that Exhibits 1025-1034 and 1036 have not been
authenticated and, therefore, should be excluded under Federal Rule of
Evidence 901.[6] PO Mot. 14-15. Progressive asserts that the only evidence
indicating that Exhibits 1025-1034 and 1036 are authentic are the
declarations of Mr. Stark and Mr. Klausner, and those declarations are
hearsay and should be excluded. *Id.* at 15.

We agree with Liberty that Exhibits 1025-1027, 1030, 1031, 1033,
and 1034 are self-authenticating material because they each purport to be a
newspaper or periodical that requires no extrinsic evidence of authenticity in
order to be admitted under Federal Rule of Evidence 902(6).[7] Pet. Opp. 13.

---

[6] Fed. R. Evid. 901. Authenticating or Identifying Evidence
   (a) In General. To satisfy the requirement of authenticating or
       identifying an item of evidence, the proponent must produce
       evidence sufficient to support a finding that the item is what the
       proponent claims it is.
[7] Fed. R. Evid. 902. Evidence that Is Self-Authenticating

37

**A5036**

Case CBM2012-00010
Patent 7,124,088 B2

For instance, Exhibit 1025 is an article titled "What TCP/IP Protocol
Headers Can Tell Us About the Web" that was co-authored by Progressive's
expert, Dr. Jeffay, and published in the Proceedings of ACM SIGMETRICS
at pages 245-256 in June 2001. Ex. 1025, p. 1. Even if we assume that
Exhibits 1025-1027, 1030, 1031, 1033, and 1034 are not self-authenticating
material under Federal Rule of Evidence 902(6), the rebuttal declaration of
Mr. Stark properly authenticates these Exhibits independently of that rule.
Ex. 1023 ¶¶ 3-5, 8, 9, 11, and 12.

We also agree with Liberty that Exhibits 1028, 1029, and 1036 are
properly authenticated under Federal Rule of Evidence 901(b)(8)[8] because
the rebuttal declarations of Mr. Stark and Mr. Klausner identify where and
when each Exhibit was obtained, the rebuttal declaration of Mr. Klausner
provides a brief description of the place where each Exhibit was maintained,
and each Exhibit was at least 20 years old when offered. Pet. Opp. 13
(citing Ex. 1023 ¶¶ 6-7, Ex. 1035 ¶¶ 4-5). Finally, we agree with Liberty
that Exhibits 1032 and 1033 are authenticated properly by the declarations of

_____

The following items of evidence are self-authenticating; they require no
extrinsic evidence of authenticity in order to be admitted:
> (6) Newspapers and Periodicals. Printed material purporting to be
> issued by a public authority.

[8] Fed. R. Evid. 901(b)(8). Evidence About Ancient Documents or Data
Compilations.
For a document or data compilation, evidence that it:
> (A) is in a condition that creates no suspicion about its
> authenticity;
> (B) was in a place where, if authentic, it would likely be; and
> (C) is at least 20 years old when offered.

38

A5037

Case CBM2012-00010
Patent 7,124,088 B2

Mr. Stark (Ex. 1023 ¶¶ 10-11) and Mr. Klausner (Ex. 1024 ¶¶ 13-14, n. 7).
*Id.* at 13-14.

For the foregoing reasons, we decline to exclude Exhibits 1025-1034
and 1036 as unauthenticated evidence.

### 4. Whether Exhibits 1033 and 1034 Should be Excluded as Irrelevant and Prejudicial

Progressive contends that, even if it assumes that Exhibits 1033 and
1034 are authentic and not hearsay, they should be excluded because they
are irrelevant and prejudicial under Federal Rules of Evidence 402[9] and
403.[10] PO Mot. 15. Progressive argues that Exhibits 1033 and 1034 are
purportedly from October 1998, which is after the time period of July 1998
used by Liberty's experts to establish the knowledge of one with ordinary
skill in the art. *Id.* (citing Ex. 1009 ¶ 14, Ex. 1016 ¶ 20). Progressive also
asserts that it was not given an opportunity to address these references. *Id.*

---

[9] Fed. R. Evid. 402. General Admissibility of Relevant Evidence.
Relevant Evidence is admissible unless any of the following provides
otherwise:
>    (a) the United States Constitution;
>    (b) a federal statute;
>    (c) these rules; or
>    (d) other rules prescribed by the Supreme Court.

[10] Fed. R. Evid. 403. Excluding Relevant Evidence for Prejudice,
Confusion, Waste of Time, or Other Reasons.
The court may exclude relevant evidence if its probative value is
substantially outweighed by a danger of one or more of the following:
unfair prejudice, confusing the issues, misleading the jury, undue delay,
wasting time, or needlessly presenting cumulative evidence.

39

A5038

Case CBM2012-00010
Patent 7,124,088 B2

We agree with Liberty that Exhibits 1033 and 134 both have
publication dates in October 1998, which is prior to the earliest effective
filing date of the '088 patent—July 30, 1999. Pet. Opp. 15. Even if we
assume that the critical date of the '088 patent is July 1998, it is well settled
that references that have publication dates after the critical date may be cited
to show the state of the art at or around the time of the invention. *Eli Lilly
and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 969-70 (Fed. Cir. 2001); *see also
In re Wilson*, 311 F.2d 266, 268-269 (CCPA 1962). Moreover, we note that
there is a strong public policy for making all information filed in an
administrative proceeding available to the public, especially in a covered
business method patent review, which determines the patentability of claims
in an issued patent. It is better to have a complete record of the evidence
submitted by the parties than to exclude particular pieces of evidence.

For the foregoing reasons, we decline to exclude Exhibits 1033 and
1034 as irrelevant and prejudicial. In summary, Progressive's motion to
exclude evidence is denied.

### H. Liberty's Motion to Exclude Evidence

Liberty seeks to exclude certain portions of the testimonial evidence
offered by Progressive's two experts—namely paragraphs 10-14 and 17-38
of the declaration of Dr. Kevin Jeffay (Ex. 2202), and paragraphs 20, 23, 24,
39-42, 44, 455, 47, 48, 50-52, and 54-56 of the declaration of Ms. Ruth Ann
Cacchione (Ex. 2204). Paper 46 ("Pet. Mot."). Liberty presents the
following arguments in support of its motion to exclude evidence: (1)
Dr. Jeffay and Ms. Cacchione do not possess sufficient knowledge about

40

**A5039**

Case CBM2012-00010
Patent 7,124,088 B2

online computer systems used for insurance processing in 1998 and, in particular, Dr. Jeffay is not qualified to provide testimony about the pertinent aspects of insurance; and (2) Dr. Jeffay and Ms. Cacchione provide insufficient underlying facts or data upon which their opinions could be based, in violation of Federal Rule of Evidence 702. Pet. Mot. 1-10.

Progressive opposes Liberty's motion to exclude. Paper 49 ("PO. Opp."). Progressive presents the following arguments in support of its opposition: (1) the evidentiary objections upon which Liberty bases its motion to exclude fail to provide "sufficient particularity to allow correction in the form of supplemental evidence," in violation of 37 C.F.R. § 42.64(b)(1); and (2) Dr. Jeffay and Ms. Cacchione are qualified "by knowledge, skill, experience, training, or education" and their testimony is "based on sufficient facts or data," in accordance with Federal Rule of Evidence 702. PO Opp. 1-14. Liberty filed a reply to Progressive's opposition to its motion to exclude. Paper 51.

The current situation does not require us to assess the merits of Liberty's motion to exclude. As discussed above, even without excluding the aforementioned paragraphs in the declarations of Dr. Jeffay and Ms. Cacchione, we have concluded that Liberty has demonstrated, by a preponderance of the evidence, that claims 1-46 of the '088 patent are unpatentable under § 103(a). Accordingly, Liberty's motion to exclude evidence is dismissed as moot.

41

**A5040**

Case CBM2012-00010
Patent 7,124,088 B2

### III.    CONCLUSION

Liberty has demonstrated, by a preponderance of the evidence, that claims 1-46 of the '088 patent are unpatentable based on the grounds of unpatentability set forth in the table below.

| Claims | Basis | Reference(s) |
|---|---|---|
| 1-8, 12-41, and 44-46 | § 103(a) | NAIC |
| 4-11, 42, and 43 | § 103(a) | NAIC and Lockwood |

### IV.    ORDER

In consideration of the foregoing, it is

ORDERED that claims 1-46 of the '088 patent are CANCELLED;

FURTHER ORDERED that Progressive's motion to exclude evidence is DENIED; and

FURTHER ORDERED that Liberty's motion to exclude evidence is DISMISSED as moot.

42

**A5041**

Case CBM2012-00010
Patent 7,124,088 B2

PETITIONER:

J. Steven Baughman
James R. Myers
Nicole M. Jantzi
Ropes & Gray
steven.baughman@ropesgray.com
james.myers@ropesgray.com
nicole.jantzi@ropesgray.com

For PATENT OWNER

James A. Collins
Joseph Hanasz
Robert Mallin
BRINKS HOFER GILSON & LIONE
jcollins@brinkshofer.com
jhanasz@brinkshofer.com
rmallin@brinkshofer.com

43

**A5042**



# THE OXFORD

## DESK DICTIONARY
## AND THESAURUS

American Edition

If you purchased this book without a cover, you should be aware that this book is stolen property. It was reported as "unsold and destroyed" to the publisher, and neither the author nor the publisher has received any payment for this "stripped book."

*Editor in Chief:* Frank R. Abate
*Managing Editor:* Elizabeth J. Jewell
*Editors:* Jacquelyn S. Goodwin, Ruth Handlin Manley, Julie Marsh, Christine L. Stevens
*Editorial Assistant:* Deborah Argosy
*Proofreaders:* Joan Carlson, Doris Eder, Robin Fleisig, Christine Kelley
*Data Entry:* Elaine Chasse, Linda Costa, Kimberly Roberts, Tina Wholean

THE OXFORD DESK DICTIONARY AND THESAURUS:
American Edition
is a concise edition of *The Oxford Dictionary and Thesaurus:*
*American Edition.*

A Berkley Book / published in mass-market paperback
by arrangement with Oxford University Press, Inc.

PRINTING HISTORY
Oxford University Press edition / July 1997
Berkley edition / August 1997

Copyright © 1997 by Oxford University Press, Inc.
Published by Oxford University Press, Inc.,
198 Madison Avenue, New York, New York 10016.
Oxford is a registered trademark of Oxford University Press.
All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise,
without the prior permission of Oxford University Press.

The Penguin Putnam Inc. World Wide Web site address is
http://www.penguinputnam.com

ISBN: 0-425-16008-4

BERKLEY®
Berkley Books are published by The Berkley Publishing Group,
a division of Penguin Putnam Inc.,
375 Hudson Street, New York, New York 10014.
BERKLEY and the "B" design
are trademarks belonging to Penguin Putnam Inc.

PRINTED IN THE UNITED STATES OF AMERICA

15  14  13  12  11  10  9  8

# Contents

Preface                                                      vii
How to use the *Oxford Desk Dictionary and Thesaurus*         ix
Abbreviations                                                 xi
Key to the pronunciations                                    xiv

*Oxford Desk Dictionary and Thesaurus*                     1–938

Special Reference Sections                                   939
  Signs and Symbols                                          941
  Mathematical Notation                                      942
  Heat Index/Wind Chill                                      943
  Standard Weights and Measures
    with Metric Equivalents                                  944
  Metric Weights and Measures
    with Standard Equivalents                                945
  Arabic and Roman Numerals/Multiplication Tables            946
  Chemical Elements                                          948
  Temperature                                                949
  Time Periods                                               950
  Wedding Anniversary Gifts                                  951
  Books of the Bible                                         952
  Presidents of the United States of America                953
  States of the United States                                954
  Area Codes                                                 956
  Countries of the World                                     958
  Easily Confused Words                                      964
  Terms for Groups of Animals                                971

A5044

papa /pápə, papá/ n. father (esp. as a child's word).

pa·pa·cy /páypəsee/ n. (pl. -cies) 1 pope's office or tenure. 2 papal system.

pa·pal /páypəl/ adj. of a pope or the papacy. □□ pa·pal·ly adv.

pa·paw var. of PAWPAW.

pa·pa·ya /pəpíə/ n. 1 edible yellow fruit with orange flesh. 2 tropical tree bearing this.

paper /páypər/ • n. 1 material manufactured in thin sheets from the pulp of wood or other fibrous substances, used for writing or drawing or printing on, or as wrapping material, etc. 2 (attrib.) a made of or using paper. b flimsy like paper. 3 = NEWSPAPER. 4 a printed document. b (in pl.) identification or other legal documents. 5 = WALLPAPER. 6 essay or dissertation. 7 piece of paper. • v. 1 apply paper to, esp. decorate (a wall, etc.) with wallpaper. 2 (foll. by over) disguise or try to hide. □ paper clip clip of bent wire or of plastic for holding several sheets of paper together. paper tiger apparently threatening, but ineffectual, person or thing. paper trail documentation of transactions, etc. □□ pa·per·er n. pa·per·less adj. pa·per·y adj.

• n. 3 tabloid, daily, weekly, journal, gazette, publication, periodical, newsletter, organ, throw·away, rag, sheet. 4 instrument, form, certificate, deed, credential(s), identification; docket, file, dossier. 6 article, composition, assignment, report, thesis, study, tract, analysis, critique, monograph. • v. 1 wallpaper, line, decorate. 2 cover up; see also COVER·UP 1.

pa·per·back /páypərbak/ • n. (also pa·per·bound) • adj. (of a book) bound in stiff paper. • n. a paperback book.

pa·per·boy /páypərboy/ n. (fem. pa·per·girl /-gərl/) boy or girl who delivers or sells newspapers.

pa·per·weight /páypərwayt/ n. small heavy object for keeping loose papers in place.

pa·per·work /páypərwərk/ n. 1 routine clerical or administrative work. 2 documents, esp. for a particular purpose.

pa·pier mâché /páypər məsháy, papyáy/ n. paper pulp used for molding into boxes, trays, etc.

pa·pil·la /pəpílə/ n. (pl. pa·pil·lae /-pílee/) small nipplelike protuberance in a part or organ of the body. □□ pap·il·lar·y adj. pap·il·lose adj.

pa·poose /papóos, pə-/ n. young Native American child.

pa·pri·ka /paprékə, pápriká/ n. 1 fist. a red sweet or aromatic condiment made from it.

Pap smear /pap/ (also Pap test) n. test for cervical cancer, etc., done by a cervical smear.

pa·py·rus /pəpírəs/ n. (pl. pa·py·ri /-rī/) 1 aquatic plant with dark green stems topped with fluffy inflorescences. 2 writing material prepared in ancient Egypt from the pithy stem of this.

par /paar/ n. 1 average or normal amount, degree, condition, etc. (by up so par). 2

equality; equal footing. 3 Golf number of strokes a skilled player should normally require for a hole or course. 4 Stock Exch. face value of stocks and shares, etc. 5 (in full par of exchange) recognized value of one country's currency in terms of another's. □ par for the course collog. what is normal or to be expected.

• 1 a standard, normal, norm, expectation. 2 level; see also PARITY 1.

par-/par, paar/ prefix var. of PARA- before a vowel or h (paraldehyde, parody; parhelion).

pa·ra /párə/ prefix (also par-) 1 beside (paramilitary). 2 beyond (paranormal).

par-a-ben·zo·ic acid /para-aminobenzóïk/ n. Biochem. compound used in suntan lotions and sunscreens to absorb ultraviolet light. ¶ Abbr.: PABA.

par·a·ble /párəbəl/ n. 1 narrative of imagined events used to illustrate a moral or spiritual lesson. 2 allegory.

• fable, lesson, morality tale.

pa·rab·o·la /pərábələ/ n. open plane curve formed by the intersection of a cone with a plane parallel to its side.

par·a·bol·ic /párəbólik/ adj. 1 of or expressed in a parable. 2 of or like a parabola. □□ par·a·bol·i·cal·ly adv.

par·a·chute /párəshoot/ • n. rectangular or umbrella-shaped apparatus allowing a slow and safe descent, esp. from an aircraft. • v. convey or descend by parachute. □□ par·a·chut·ist n.

pa·rade /pəráyd/ • n. 1 formal or ceremonial muster of troops for inspection. 2 public procession. 3 ostentatious display. • v. 1 a march through (streets, etc.) in procession. b mar march ceremonially. 2 in display ostentatiously. □□ pa·rad'er n.

• n. 2 march, train, file, promenade, cortège; column. 3 exhibition, show, spectacle, array, splash. • v. 1 march, pass in review, promenade, walk, file. 2 flaunt, show (off), brandish, wave, air, literary vaunt.

par·a·digm /párədim/ n. 1 example or pattern. 2 Gram. representative table of the inflections of a noun, verb, etc. □□ par·a·dig·mat·ic /-digmátik/ adj. par·a·dig·mat·i·cal·ly adv.

par·a·dise /párədīs/ n. 1 heaven. 2 place or state of complete happiness. 3 (in full earthly paradise) abode of Adam and Eve; garden of Eden. □□ par·a·dis·i·a·cal /-disíəkəl/ adj.

• 1 Zion, Elysium, Elysian Fields, happy hunting ground, the promised land, Valhalla. 2 heaven on earth, dreamland, seventh heaven, (Garden of) Eden, utopia, Shangri-la; bliss, rapture, heaven.

par·a·dox /párədoks/ n. 1 a seemingly absurd or contradictory statement, even if actually well-founded. b self-contradictory or essentially absurd statement. 2 person or thing having contradictory qualities, etc. □□ par·a·dox'i·cal adj. par·a·dox'i·cal·ly adv.

• contradiction, self-contradiction, incongruity, inconsistency, absurdity, ambiguity, enigma, puzzle. □□ paradoxical impossible, improbable, illogical.

par·af·fin /párəfin/ n. (also par'af·fin wax)

waxy mixture of hydrocarbons used in candles, waterproofing, etc.

par·a·gon /párəgon, -gən/ n. model of excellence.

• epitome, archetype, prototype, quintessence, pattern, standard, exemplar, ideal.

par·a·graph /párəgraf/ • n. 1 distinct section of a piece of writing, beginning on a new line, indented line. 2 symbol (usu. ¶) used to mark a new paragraph. 3 short item in a newspaper, esp. of only one paragraph. • v. arrange in paragraphs. □□ par·a·graph·ic /-gráfik/ adj.

par·a·keet /párəkeet/ n. small usu. long-tailed parrot.

par·a·le·gal /párəleegəl/ • adj. of auxiliary aspects of the law. • n. person trained in subsidiary legal matters.

par·al·lax /párəlaks/ n. apparent difference in the position or direction of an object caused when the observer's position is changed. □□ par·al·lac·tic /-láktik/ adj.

par·al·lel /párəlel/ • adj. 1 side by side and having the same distance continuously between them. 2 precisely similar, analogous, or corresponding simultaneous. • n. 1 person or thing precisely analogous or equal to another. 2 comparison. 3 (in full parallel of latitude) Geog. a each of the imaginary parallel circles of constant latitude on the earth's surface. b corresponding line on a map (the 49th parallel). • v.m. 1 be parallel to; correspond to. 2 represent as similar; compare. □□ par·al·lel·ism n.

• adj. 2 congruent, analogical, corresponding, like, matching, homologous, coordinate, equivalent. • n. 1 analog, match, homologue, equivalent, counterpart, equal. 2 analogy, parallelism, equivalence, correspondence, symmetry, equality; see also COMPARISON 3. • v. 1 match, equate or or with, be likened to, correlate to or with, compare with or to, imitate, repeat, echo; keep pace with, conform to or with, balance, set off, offset. 2 match, equate, liken, juxtapose, associate, correlate.

par·al·lel·o·gram /párəleləgram/ n. Geom. four-sided plane rectilinear figure with opposite sides parallel.

pa·ral·y·sis /pərálisis/ n. (pl. pa·ral·y·ses /-seez/) 1 impairment or loss of esp. the motor function of the nerves. 2 state of utter powerlessness. □□ par·a·lyt·ic /páralitik/ adj. & n. par·a·lyt·i·cal·ly adv.

par·a·lyze /párəlīz/ v.t. 1 affect with paralysis. 2 render powerless; cripple. □□ par·a·ly·za'tion n. par·a·lyz·ing·ly adv.

• 2 disable, incapacitate; immobilize.

par·a·me·dic /párəmeedik/ n. freshwater protozoan of a characteristic slipper-like shape covered with cilia.

par·a·med·ic /párəmédik/ n. 1 paramedical worker. 2 person trained in emergency medical procedures.

par·a·med·i·cal /párəmédikəl/ adj. (of services, etc.) supplementing and supporting medical work.

pa·ram·e·ter /pərámitər/ n. 1 Math. quantity constant in the case considered but varying in different cases. 2 a characteristic or feature. b (loosely) constant element

or factor, esp. serving as a limit or boundary. □□ par·a·met·ric /páramétrik/ adj. par·ras'e·tri·ze v.tr.

par·a·mil·i·tar·y /páramílitəree/ adj. (of forces) ancillary to and similarly organized to military forces.

par·a·mount /páramownt/ adj. supreme; requiring first consideration. □□ par·a·mount·cy n.

• preeminent, chief, dominant, main, major, predominant, cardinal, first, prime, primary, principal, essential.

par·a·mour /páramoor/ n. illicit lover of a married person.

• love, inamorato, inamorata, mistress, gigolo, concubine, kept woman, (the) other woman.

par·a·noia /páranóyə/ n. 1 personality disorder esp. characterized by delusions of persecution and self-importance. 2 abnormal tendency to suspect and mistrust others. □□ par·a·noi'ac adj. & n. par·a·noid /-noyd/ adj. & n.

par·a·nor·mal /páranórməl/ adj. beyond the scope of normal objective investigation or explanation. □□ par·a·nor'mal·ly adv.

par·a·pet /párəpit/ n. 1 low wall at the edge of a roof, balcony, etc., or along the sides of a bridge. 2 defense of earth or stone to conceal and protect troops. □□ par·a·pet·ed adj.

par·a·pher·na·lia /párəfərnáyliə/ n.pl. (also treated as sing.) miscellaneous belongings, equipment, accessories, etc.

• apparatus, outfit, kit, appliances, utensils, gear, rig, material(s), materiel, things, trucks.

par·a·phrase /párəfrayz/ • n. free rendering or rewording of a passage. • v.tr. express the meaning of (a passage) in other words. □□ par·a·phras·tic /-frástik/ adj.

• n. rephrasing, rewriting, rewrite, rehash, rendition, version. • v. rephrase, metaphrase, reword, restate.

par·a·ple·gia /párəpleejə/ n. paralysis of the legs and part or the whole of the trunk. □□ par·a·ple'gic adj. & n.

par·a·psy·chol·o·gy /párəsīkólojee/ n. the study of mental phenomena outside the sphere of ordinary psychology. □□ par·a·psy·cho·log·i·cal /-sīkəlójikəl/ adj. par·a·psy·chol'o·gist n.

par·a·quat /párəkwot/ n. quick-acting herbicide, becoming inactive on contact with the soil.

par·a·site /párəsīt/ n. 1 organism living in or on another and benefiting at the expense of the other. 2 person who lives off or exploits another or others. □□ par·a·sit·ic /-sítik/ adj. par·a·sit'i·cal adj. par·a·sit'i·cal·ly adv. par·a·si·tol·o·gy /-tóləjee/ n. par·a·si·tol'o·gist n.

• 2 leech, bloodsucker, hanger-on, sponge, cadger.

par·a·sol /párəsawl, -sol/ n. light umbrella used to give shade from the sun.

par·a·sym·pa·thet·ic /párəsimpathétik/ adj. Anat. relating to the part of the autonomic nervous system that controls the slowing of the heartbeat, constriction of the pupils, etc.

Exhibit 1001    Case: 14-1538    Document: 30    Page: 117    Filed: 09/25/2014



US007124088B2

(12) **United States Patent**
     Bauer et al.

(10) Patent No.: **US 7,124,088 B2**
(45) Date of Patent: **Oct. 17, 2006**

(54) **APPARATUS FOR INTERNET ON-LINE INSURANCE POLICY SERVICE**

(75) Inventors: **Alan R. Bauer**, Mill Valley, CA (US); **Amanda L. Bowman**, Bedford, OH (US); **Richard J. Keyser**, Euclid, OH (US); **Megan N. McNamara**, Rocky River, OH (US); **Cheryl L. Urminski**, Cleveland Heights, OH (US); **Leslie Youngstrom**, Sacramento, CA (US); **Toby Alfred**, Orange, OH (US)

(73) Assignee: **Progressive Casualty Insurance Company**, Mayfield Village, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/364,803**

(22) Filed: **Jul. 30, 1999**

(65) **Prior Publication Data**

US 2002/0116228 A1    Aug. 22, 2002

(51) Int. Cl.
     *G06Q 40/00*    (2006.01)
(52) U.S. Cl. ...................................................... **705/4**
(58) Field of Classification Search .................. 705/4, 705/35; 283/54; 902/5; 709/217
     See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,831,526 A | * | 5/1989 | Luchs et al. | 364/401 |
| 5,797,134 A | | 8/1998 | McMillan et al. | |
| 5,809,478 A | * | 9/1998 | Greco et al. | 705/4 |
| 5,845,256 A | * | 12/1998 | Pescitelli et al. | 705/4 |
| 5,956,691 A | * | 9/1999 | Powers | 705/4 |
| 6,869,362 B1 | * | 3/2005 | Walker et al. | 463/25 |

FOREIGN PATENT DOCUMENTS

GB        935208 A2 *  11/1999

WO        WO 20052616 A2 *  9/2000

OTHER PUBLICATIONS

Pasher, Auto Web site takes off, Mar. 1998, National Underwriter (Property & Casualty/Risk & Benefits Management), vol. 102 No. 11, pp. 9 and 16.*
Festa, For Insurance Sales, Turn to the 'Web', Aug. 1998, Insurance Regulator, vol. 5 No. 31, p. 1.*
Business Editors, Electric Insurance Joins Intuit's Quicken InsureMarket Offering Online Auto Policies in 6 States, Dec. 1998, Business Wire.*
Sabori et al., A level playing field, Apr. 1998, LIMRA's MarketFacts, vol. 17 No. 2, pp. 48-49.*
Rodgers, Hawaii insurer finds an opal in the rough, May 1999, Insurance & Technology, vol.24 No. 5, p. 27.*
Esurance Launches New Car Insurance Program, May 2002, PR Newswire.*

* cited by examiner

*Primary Examiner*—Joseph Thomas
*Assistant Examiner*—Christopher L. Gilligan
(74) *Attorney, Agent, or Firm*—Brinks Hofer Gilson & Lione

(57) **ABSTRACT**

An Internet on-line insurance policy service system that facilitates real-time automated communication of policy information, adjustment of policy parameters, calculation and communication of resulting policy quotes, and implementation of policy changes, while obviating insurer personnel involvement and supervision of the communication. The system comprises a plurality of software modules relating to on-line real-time communication of existing policy information, testing of a wide range of variations in policy parameters, computing and communicating changes in policy premiums that would result from such variations, communicating desired changes in policy parameters and implementing desired policy changes. Other modules relate to communication of claims information and the providing of on-line forms.

**41 Claims, 6 Drawing Sheets**



Liberty Mutual
Exhibit 1001

Page 000001

A5067

FIG.1



A5068



FIG. 2



FIG.3



FIG.4

POLICY SUMMARY PAGE
101
WHAT IF?
100
CHANGE A VEHICLE PAGE
102
CONTINUE»
NEW VEHICLE INFORMATION PAGE (OLD VEHICLE)
104
CONTINUE»
NEW VEHICLE INFORMATION PAGE (NEW VEHICLE YEAR)
106
CONTINUE»
NEW VEHICLE INFORMATION PAGE (NEW VEHICLE MAKE)
108
CONTINUE»
NEW VEHICLE INFORMATION PAGE (NEW VEHICLE MODEL)
110
CONTINUE»
NEW VEHICLE INFORMATION PAGE (WHICH DETAILS)
112
CONTINUE»
COVERAGE INFORMATION
114
CALCULATE RATE
116
ESTIMATED EFFECT ON POLICY PREMIUM
118
SUMMARY OF QUOTES REQUESTED
120
SUMMARY OF QUOTES REQUESTED
122



FIG.5



FIG. 6

FROM PERSONAL PROGRESSIVE MAIN PAGE
DOES POLICY HAVE CLAIMS?
160
NO
YES
PRESENT PROGRESSIVE MEDIA TEXT ON CLAIMS PREPAREDNESS
162
* PRESENT CLAIM NUMBERS FOR THIS POLICY
* USER SELECTS CLAIM NUMBER TO VIEW
164
IS THIS CLAIM ARCHIVED?
166
YES
NO
* INITIATE OVERNIGHT CLAIM RESTORE PROCESS
* INFORM USER TO RETURN LATER TO VIEW CLAIM
168
DISPLAY CLAIMS INFORMATION
* INCIDENT DATE
* CLAIM STATUS
* DRIVER INVOLVED
* VEHICLE INVOLVED
* PROGRESSIVE CLAIM REPRESENTATIVES
170
COVERAGE'S
* DISPLAY COVERAGE AT TIME OF ACCIDENT
172
ESTIMATES
* DISPLAY GENERIC INFORMATION ABOUT ESTIMATES
174
RENTALS
* DISPLAY GENERIC INFORMATION ON VEHICLE RENTALS
176
REPAIR
* DISPLAY GENERIC INFORMATION ON VEHICLE REPAIR
178
BE PREPARED
* DISPLAY GENERIC INFORMATION ON WHAT TO DO AFTER ACCIDENT
180
FACE SHEET COMMUNICATION
* USER SENDS MESSAGE TO PROGRESSIVE CLAIMS REPRESENTATIVE
182
USER COMMUNICATION GETS ADDED TO CUSTOMER DIARY
184

US 7,124,088 B2

1

**APPARATUS FOR INTERNET ON-LINE
INSURANCE POLICY SERVICE**

BACKGROUND OF THE INVENTION

The present invention relates to data communication and
processing systems, and particularly to a system for auto-
mated Internet on-line communication of proposed and
actual changes to insurance policy parameters, assessing
cost consequences of such proposed and actual changes,
updating the insured's policy file and implementing desired
policy changes, while avoiding insurer personnel involve-
ment in the communication, updating and policy amendment
process.

As used in this application, the term "Internet" means the
global computer information system both as it exists cur-
rently and as it may change, evolve or develop over time and
including any replacement or successor systems.

Vehicle insurance policies are now a legal requirement for
driving rights in most jurisdictions and nearly all drivers
own or are required to own some type of insurance. Con-
ventional methods for acquiring such a policy usually entail
relatively lengthy application processes between the buyer
and a personal representative of the insurer such as either an
insurance company salesperson or an independent agent for
the company. The application process requires a communi-
cation of personal and historical data of the buyer and
whatever vehicles are involved and their locations to allow
the insurer to classify the prospective applicant in predeter-
mined actuarial classes and for quoting a cost to the appli-
cant. In addition, for existing customers of the insurance
company, changes in policy parameters such as changes in
residence, the vehicle locations, number of household driv-
ers or acquisition of new or replacement of old vehicles
covered by the policy require regular communication
between the customer and the insurer or its agents. When
such communication is required to be handled in writing,
telephonically, or personally by the company representative
or independent agent, the time consumption and associated
costs for such personal handling can present cost and
servicing problems which need to be minimized. Any way
that the insurer can reduce personnel involvement in
addressing policyholder services is a way that can improve
efficiency and reduce costs—costs that can be eliminated to
result in lower rates to a consumer buying the insurance.

The present invention contemplates a new and improved
insurance policy service and delivery system for communi-
cating changes in policy parameters to an insurer via an
Internet on-line automated system, thereby obviating repre-
sentative or agent personal involvement in the interfacing
and communicating of policy parameter changes, policy
changes and associated charge adjustments between the
customer and the insurer.

A BRIEF SUMMARY OF THE INVENTION

In accordance with the present invention, there is dis-
closed a method and apparatus for Internet on-line insurance
policy service and delivery for real-time automated selective
adjustment by a user of policy parameters, and for system
computation and communication of resulting cost adjust-
ments due to the policy parameter changes. The system
comprises an information module for identifying a user to
the system and for communicating currently existing policy
parameters to the policyholder. A policy adjustment module
selectively communicates parameter changes made by the
user to the insurer's computer system and the computer then

2

generates in real-time the resulting policy cost attributable to
the parameter change. The cost adjustments can be commu-
nicated in the form of a quote, and if the computer is so
instructed by the user, the policy change and related cost
adjustment can be formally submitted and implemented.

In accordance with more limited aspects of the invention,
the system further includes a claims information module for
communicating information relative to claims processing,
and a funds transfer module for on-line payment of accounts
by a user.

In accordance with yet another aspect of the present
invention, the parameter changes can comprise, for example,
a change in garage location of the vehicle being insured or
the personal residence of the holder of the policy, a change
in the vehicles insured under the policy, the addition or
deletion of one or more drivers under the policy or changes
in coverages, deductible amounts or policy limits.

One benefit of the present invention is a more efficient
handling of policyholder services to reduce inconvenience to
the insurance customer and to reduce handling and involve-
ment requirements of insurer personnel to attend to such
services, thereby reducing overhead costs and ultimately
providing an ability to insure policyholders on a more cost
effective basis.

Another benefit of the subject invention is a reduction in
the time cycle for communicating and implementing policy
changes thereby assuring a more accurate coverage and
minimizing time periods when the policy parameter changes
are not properly incorporated into the policy.

Other benefits and advantages of the subject new policy
service will become apparent to those skilled in the art upon
a reading and understanding of the specification.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention may take physical form in certain parts and
steps and arrangements of parts and steps, the preferred
embodiments of which will be described in detail in the
specification and illustrated in the accompanying drawings
which form a part hereof and wherein:

FIG. 1 is a flow diagram for accessing the subject system
with a personal security code;

FIG. 2 is a block flow diagram identifying the principal
processing modules of the subject invention;

FIG. 3 is a flow diagram illustrating steps for updating a
policy change comprising a vehicle replacement;

FIG. 4 is a flow diagram of the steps for acquiring an
estimate of a rate change resulting from a possible vehicle
replacement;

FIG. 5 is a flow diagram of the steps of implementing a
policy change due to an address or telephone change; and

FIG. 6 is a flow diagram of communicating claims infor-
mation from the system.

DETAILED DESCRIPTION OF THE
INVENTION

The subject invention is related to a data processing
system especially applicable to the insurance industry
wherein a policyholder can, through Internet on-line access-
ing, view and update his or her particular policy information.
After the policyholder/customer authenticates himself/her-
self, the system retrieves the verification, or other informa-
tion requested by the policyholder from the system and
displays it to the policyholder via the Internet. A user-
friendly interface guides the customer through various
activities including, without limitation, billing information,

US 7,124,088 B2

3

making a payment via a credit card or on-line check, policy information, state specific contract information, quoting an endorsement for vehicle replacement, address changes and claims information. The system displays the premium amount and variance and updates the customer file at the customer's request, without need for personal handling by an individual representative of the insurer or an independent agent. Most of the information presented to the customer is specific to that customer's policy only and is, of course, maintained confidential through a security code system and transferred/viewed via a secure server. Generic information generally describing the policy is also provided. The subject invention uniquely provides on-line viewing and updating of the customer's existing information and facilitates real-time updating of the policy parameters and the ability to implement policy changes on-line. Although discussed with primary reference to automobiles as the insured vehicle, the invention is applicable to any other type of insured item, i.e., boats, airplanes, personal or real property or any other thing that is subject to an insurance policy, as well as to other kinds of insurance that may be provided, such as life, disability, medical, dental, credit insurance and general liability insurance.

The subject system contains four critical areas or modules of content with the capability of expansion to additional product and policy services: policy information, policy updating, claims information and payment enablement via electronic funds transfer. The following outline details these modules and the subsequent detailed description of the invention will follow along this outline.

I. Policy Information Displayed for the Specific Policyholder Includes:

A. Billing and Account Information
Account status
Amount and receipt date of the last payment
Amount and receipt date of the renewal payment (if applicable)
Current amount due and due date
Bill schedule
Account payment history

B. Policy Details
Mailing address
Listed drivers, age, gender, driver type and proof of financial responsibility status
Driving records for each driver listed on policy
Year, make, model and vehicle identification number (VIN #) for each vehicle listed on the policy
State policy contract valid for the specific policy
Agent of record name, address and phone number

C. Coverages and Premiums
Coverage limits listed by vehicle
Premium displayed by coverage and vehicle
Policy fees and taxes for total policy:

II. Payment Functionality Includes
Account status
Amount and receipt date of the last payment
Amount and receipt date of the renewal payment (if applicable)
Select a payment amount of either the current amount due, current amount and renewal payment, an amount entered that is greater than the minimum amount due or pay in full
Select payment method of on-line check or credit card

4

III. Policy Updates Include the Following:

A. Vehicle Replacement
Selection of which vehicle on the policy the insured wants to replace
Selection of year, make, model and submodel the insured wants to quote
Selection for physical damage coverages specific for the vehicle being quoted
Listing of resultant premium change over the rest of the policy term
Comparison of premium over the entire policy term
Ability to update the policy for the vehicle replacement
Revised billing schedule
Quote summary of all quotes obtained by the customer

B. Vehicle Addition
Selection for year, make, model and submodel the insured wants to add to the policy
Garaging address, information about the car, and leasing/financing information collected
Selection for physical damage coverages specific for the vehicle being quoted
Listing of resultant premium change over the rest of the policy term
Comparison of premium over the entire policy term
Ability to update the policy for the vehicle replacement
Revised billing schedule
Quote summary of all quotes obtained by the customer

C. Address/Telephone Change
Address displayed
Requestor verified
New address/telephone number collected
Update garaging address by vehicle
Listing of resultant premium change over the rest of the policy term
Comparison of premium over the entire policy term
Revised billing schedule
Summary of changes
Ability to update the address/telephone change
If only the telephone number is changed, a declaration page prints and mailings are suppressed

D. Order Duplicate Insurance Forms
Order ID cards or ID cards and duplicate declaration page sets

IV. Claims Information Includes:
Claim number, incident date and status displayed for selection
Driver and vehicle involved
Location of loss, incident report date/time
Inspection date/time
Determination of total loss
Claim features open
Claim representative name and phone number
Claims office location and street address
Display of coverage at time of incident
Payment history
Information on subrogation, if applicable
Total loss information
Estimate information
Rental and vehicle repair
Communications directly to the claim representative's desk top
Referring now to the drawings where the showings are for purposes of illustrating the preferred embodiments of the

A5075

US 7,124,088 B2

5

invention only and not for purposes of limiting same, the FIGURES show a method and apparatus for Internet on-line insurance policy servicing.

FIG. 1 is a flow diagram illustrating access to the subject system. A user can access the Internet with any conventional browser program and must first contact the Progressive home page (Progressive refers to Progressive Casualty Insurance Company of Mayfield Village, Ohio, the assignee of the subject application. "Personal Progressive" is the mark identifying a commercially implemented embodiment of the subject invention.) The process flow of FIG. 1 shows the customer can only access the system with a personal security code ("PSC") key. The system will query 10 if the customer has registered a personal security code and if the answer is "yes", the system will query 12 if the customer has forgotten the PSC and, if not, after the appropriate code is entered the customer can enter the system Accompanying this attachment is an Appendix comprising photostats of the on-line displays a customer will encounter while moving through the system. Photostatic images are segregated in accordance with the outline headings above. Such displays can also be directly accessed through the Internet with an on-line personal computer system by typing the URL "http: \\personal.progressive.com". If the initial inquiry receives an answer that the customer does not have a PSC, then the customer must add validating information comprising the customer's policy number, the zip code, a driver's license number, a date of birth and an e-mail address 16. The user next enters 18 an ID code of some kind that is personal to the user and the system will verify the entered ID code via e-mail communication. The system will then generate a unique password (PSC) 20 and the password will be sent 22 to the customer at his home address via U.S. mail. The customer cannot enter the Personal Progressive system until after receipt of the PSC.

If the customer has a PSC, but it has been forgotten, then after the inquiry 12 the customer must enter 24 the validating information sent at step 16 and the system will display the preselected identity code and resend 26 the PSC via U.S. mail and e-mail.

The foregoing steps for inquiring and implementing the PSC are necessary for maintaining the personal confidentiality of any particular customer when accessing the system.

As noted above, the subject system can be segregated into four critical areas of content. With reference to FIG. 2, these comprise policy information 30, policy changes 32, policy quotes 34 and claims information 36. A user can navigate to these particular modules from the Personal Progressive main menu 38 through web pages specifically designed to guide the customer to the desired information through clicks on alternative query marks or through the input of necessary information. Of course, the particular design of the web pages to facilitate the navigation or the customer's responses is a matter of subjective design and those shown in the Appendix, or at the URL address above, merely illustrate one particular convenient and successful page format set. Another module 37 provides the customer the ability to acquire on-line forms typically comprising duplicate insurance forms, such as ID cards and duplicate declaration page sets.

The policy information module 30 displays a variety of billing and account information, policy details and the particular coverage afforded by the cumulative premiums of the policy. The billing and account information comprises a display of the account status, i.e., whether it is active and if the account is paid to date including the amount and the receipt date of the last payment, the amount and receipt date

6

of the renewal payment, if applicable, the current amount due on the due date, the bill schedule and the account payment history. The policy details that can be viewed and verified by the customer include, without limitation, the mailing address, the driver and vehicle information including a list of drivers, their age, gender, driver type and proof of financial responsibility status. The driving record for each driver listed on the policy can also be displayed. The vehicle information includes the year, make, model and VIN # for each vehicle listed on the policy. Other details include, without limitation, a display if there is a state policy contract valid for the customer's specific policy and the name, address and phone number of the agent of record for the customer. The coverage in premiums information comprises a very detailed report of the coverage limits listed by vehicle and the premiums displayed for various types of coverage per vehicle. For example, if three different vehicles were involved, each vehicle would receive a display of what the bodily injury liability premium is for the specified term of the policy as well as various other liability premiums for items such as property damage, uninsured motorist, medical expenses and collisions, etc., i.e., all the conventional premium information that is relevant to any particular policy.

Payments module 40 also comprises a display of some relevant account information such as account status, the amount and receipt date of the last payment, and the amount and receipt date of the renewal payment (if applicable). In addition, though, the customer may select a payment amount via the current amount due, the current amount for the renewal term, pay in full or an amount that must be greater than the minimum amount due. The payment method can be selected as either an on-line check or a credit card.

The policy changes module 32 is primarily comprised of modules for changing the customer's address 42, telephone number 44 or of replacing or adding 46 a vehicle to the policy coverage.

With reference to FIG. 3, the following steps illustrate the navigation through various web pages that a customer will make to effect a vehicle replacement on the policy. The "continue" boxes can be clicked by the user to move to the next page. Initially, the customer will encounter a policy summary page 51 from which the customer will select the policy changes module 53. The policy changes menu 50 displays an option of vehicle replacement 52 in response to which the customer receives a request for verification page 54. After verification, the customer identifies 56 which vehicle from the policy is to be replaced. The identity of the new vehicle 58 is entered by the customer including the year, make, model, submodel information and VIN #. Additional information 60 relates to the use and garaging, i.e., if the car is a commuter car and whether it will be garaged at the same address as the resident address of the owner 62 or whether it will be garaged at a different address 64. If it is going to be garaged at a different address, then the system will inquire as to the different garaging location 66 or in some states, if there is more than one municipality in a zip code, the customer must indicate the correct municipality in which the vehicle is garaged, i.e., a split zip 68. In either case the system will next inquire if the vehicle is owned or leased 70. If leased 72, or owned 74, and financing payments are necessary, then the system will inquire as to the financial institution receiving the lease or financing payments 76 and the identity of the leasing company 78. After completion of this financial information, or if the vehicle is owned outright 80 by the customer, then the system will inquire as to what particular coverage information is desired for the vehicle 82. The coverage information relates to physical damage cov-

Page 000010

**A5076**

US 7,124,088 B2

7

erage such as comprehensive and collision and further coverages such as towing/labor, rental or loan lease are optionally available. As a particular assist to the customer, the system optionally provides general coverage definitions for various types of coverages offered under the subject insurance policy. After the coverage information 82 has been submitted to the system, an inquiry will be made if the vehicle must have a photo inspection 84 pursuant to state/company regulations and information is displayed accordingly. The summary of changes 86 identifies to the customer the current vehicle and its various coverages and the new replacement vehicle and its various coverages along with the date of effectiveness of the supplied policy change and the effect 88 the policy change will have on the premium, i.e., how the change would affect the premium for the remainder of the current policy term and how the change would affect the premium for the entire policy term. At this stage, the customer has only received an estimate and must verify that the change actually should be submitted 90. If submitted, then the summary of changes are again displayed along with the acknowledgment that the changes have been successfully completed 92. Each page has a "cancel" button which takes the customer to a page indicating that "your changes have been discarded", prior to final submission.

With reference to FIG. 4, often times a customer will merely want to receive a quote before purchasing a vehicle to determine what the insurance cost effect would be if the vehicle had actually been purchased. The policy quotes module 34 (FIG. 2) comprises a "what if" process, currently known as "Policy Quotes", 48 the steps of which are detailed in FIG. 4. Accordingly, after the policy summary 101 is displayed, the customer will click on the "what if" button 100 to indicate that receiving a quote for changing a vehicle is desired. Customers will also be able to reach this functionality via the main menu 38 (FIG. 2). The change of vehicle page 102 continues into a new vehicle information page 104 where the customer selects which of the present vehicles on the policy are expected to be replaced. Alternatively, the customer can specify that the new vehicle is an addition, by indicating that none of the present policy vehicles are intended to be replaced. Important information relative to the new vehicle, such as the vehicle year 106, make 108, and model 110 are solicited prompting a new vehicle information page including system memory of more detailed information indicated by the customer. Such more detailed information relates to body series, body style, engine size, cylinders, wheel drive, and the customer selects the combination of the detailed information 112 which most accurately fits the intended new vehicle. The pertinent coverage information is again solicited 114 from the customer. The current liability coverage is usually indicated to remain the same. The appropriate rate for the new vehicle is calculated at 116. The estimated effect on the policy premium is displayed 118, i.e., either an increase or decrease on the policy premium for the remaining or next period. The customer can request a summary 120 of quotes requested and such summary will be displayed 122.

FIG. 5 illustrates the steps for navigating the address change module 42 or telephone number change module 44.

FIG. 5 starts out similar to FIGS. 3 and 4 in that from the policy summary page 131 the customer must indicate that he is interested in the policy change module 133 and in particular dealing with address and telephone information 130. Customers will also be able to reach this functionality via the main menu 38 (FIG. 2). The customer indicates that he wants to update the address or telephone information 132. The user then verifies 134 his identity, identifies the new

8

address information 136 and further identifies 138 if the vehicle will be located at the same location 140 or if it will be garaged at a different location 142 and in some cases selects the appropriate municipality in a zip code 144. A summary of changes is displayed to the user 146 and the effect such address changes have on the policy premium 148. The customer then inquires as to the effect that the change would have on the bill schedule and a display 150 identified by installment date and due date of the difference between the current policy rates and the new rates as a result of the address change. The customer can then submit the changes 152 and the system will acknowledge that the changes have been successfully completed to the policy 154.

All the foregoing changes in the policy parameters, i.e., addition of vehicles, replacement of vehicles, changes in vehicle locations, or changes in customer locations, are communicated and implemented without any assistance, supervision or involvement of a personal representative of the insurance company. The customer navigates the modules to effect the changes to the policy

With particular reference to FIG. 6, it is another advantage of the system that claims information can be communicated to a customer when a claim has been made against the policy. For example, if the insured vehicle was involved in an accident, the customer has the ability with the present invention to monitor on-line the handling of the claim. In particular, if the customer selects the claims module 36 (FIG. 2) from the Personal Progressive main menu, the customer could inquire 160 if there are currently any claims on the policy. If not, the system can present an informative text on claims preparedness 162. If there has been a claim, an identifying claim number for the claim is displayed relating to incident date and whether the claim status is active or inactive. The customer can select a particular claim number for viewing 164. When a claim number is selected, the system will inquire if the claim is archived 166 to a separate storage location and if so, the relevant information must be restored to the system, usually in an overnight process, and the customer is informed to return 168 at a later time to view the desired claim information. If not archived, then the display presents detailed claim information relating to the driver and vehicle involved, the location of loss, the incident report date/time, the inspection date/time, determination of losses, whether the other claim features are yet open and the identity of the claim representative comprising the representative's name and telephone number. Additional information can be presented relating to the claims office location and street address. Other pertinent information relating to the claim relates to coverages 172 comprising a display of the coverage provided by the policy at the time of the accident or other loss, estimate information 174 for repair or reimbursements, and rental information 176 relating to vehicle rentals for temporarily providing transportation after being involved in the accident or other loss. Other information relates to repairs to the vehicle involved 178 and generic information about what to do after an accident or other loss 180. This system displays a face sheet communication allowing the customer to send a message to the claims representative of whatever information the customer feels important 182 and the customer message is added automatically 184 to the diary pertaining to this particular claim. An important advantage of the claims module 36 is its ability to allow a customer to communicate directly to the representative's desk top diary after having full access to relevant information relating to the claim.

The invention has been described with reference to preferred embodiments. Obviously, modifications and alter-

Page 000011

A5077

US 7,124,088 B2

9

10

ations will occur to others upon a reading and understanding of the specification. It is our intention to include all such modifications and alterations insofar as they come within the scope of the appended claims or the equivalents thereof.

We claim:

1. An on-line insurance policy service system comprising:
a web browser for accessing remote insurance information by an insurance policyholder and software linked to the remote insurance information;

a publicly accessible distributed network for transferring data from the web browser;

an information module, remote from the web browser coupled to the publicly accessible distributed network, that identifies the insurance policyholder and verifies an insurance policy parameter of an existing insurance policy of the insurance policyholder in real-time in response to first data received from the insurance policyholder through the publicly accessible distributed network and the web browser;

where the first data comprises a personal security code that allows access to insurance policy parameters of the insurance policyholder;

an insurance policy adjustment module, remote from the web browser coupled to the publicly accessible distributed network, that adjusts the insurance policyholder's insurance policy parameter in real-time in response to second data received from the insurance policyholder through the publicly accessible distributed network and the web browser,

where the second data comprises a selection of the insurance policy parameter;

where the insurance policy adjustment module provides an acknowledgement to the web browser in response to the adjustment of the selected insurance policy parameter within the existing insurance policy, and implements the adjustment to the existing insurance policy; and

where an insurer's computer generates an insurance document customized to the insurance policyholder as identified by the personal security code and sends the customized insurance document to the web browser in response to the second data received from the insurance policyholder through the publicly accessible distributed network and the web browser.

2. The system of claim 1 where the publicly accessible distributed network comprises a plurality of gateways that use an Internet protocol to facilitate a communication between the web browser and the information module.

3. The system of claim 1 where the insurance policy adjustment module provides the acknowledgement to the web browser after the insurance policy adjustment module implements the adjustment to the existing insurance policy.

4. The system of claim 1 where the Insurance policy adjustment module provides the acknowledgement to the web browser before the insurance policy adjustment module implements the adjustment to the existing insurance policy.

5. The system of claim 4 where the insurance policy adjustment module implements the adjustment to the existing insurance policy in response to third data received from the insurance policyholder through the publicly accessible distributed network and the web browser.

6. The system of claim 4 where the acknowledgement comprises data related to the adjustment of the selected insurance parameter.

7. The system of claim 4 where the acknowledgement comprises a summary of the adjustment of the selected insurance parameter.

8. The system of claim 7 where the summary describes a change in at least one of an insurance coverage, an insurance deductible, or a policy limit an insurance company will pay under an insurance coverage.

9. The system of claim 4 where the acknowledgement comprises a price of the adjustment to the selected insurance policy parameter.

10. The system of claim 9 where the price is related to a change in at least one of an insurance coverage, an insurance deductible, or a policy limit an insurance company will pay under an insurance coverage.

11. The system of claim 9 where the price is related to a change in at least one of a change in a party insured, an item insured, or an address.

12. The system of claim 1 further comprising, a payment module coupled to the insurance policy adjustment module.

13. The system of claim 12 where the payment module is remote from the web browser.

14. The system of claim 12 where the payment module comprises an account-based system that allows the on-line insurance policy service system to receive on-line payments through the publicly accessible distributed network.

15. The system of claim 14 where the account based system allows the insurance policyholder to send an on-line payment through the publicly accessible distributed network comprising the Internet.

16. The system of claim 12 where the payment module facilitates payment of an insurance cost through an electronic funds transfer.

17. The system of claim 12 where the payment module comprises an account-based system that allows The on-line insurance policy service system to receive electronic fund transfer payments and credit card payments through the publicly accessible distributed network.

18. The system of claim 12 where the payment module facilitates payment of an insurance cost through a credit card.

19. The system of claim 1 where the customized insurance document comprises content resident to the insurer's computer and content received from the insurance policyholder through the publicly accessible distributed network and the web browser.

20. The system of claim 1 where the web browser generates data that specifies a transmission protocol and receives data from a memory of the insurer's computer.

21. The system of claim 1 where the insurance document comprises a web page.

22. The system of claim 21 where the insurance document comprises data generated by the insurer's computer that is associated with graphics.

23. The system of claim 21 where the insurance document comprises a data file generated by the insurer's computer.

24. The system of claim 1 where the adjustment of the selected insurance policy parameter comprises a change in an item or items insured under the existing insurance policy.

25. The system of claim 1 further comprising a claims information module that communicates claim processing information to the web browser.

26. The system of claim 1 further comprising a claims information module coupled to the information module that sends information to the web browser related to a status of an insurance claim.

27. The system of claim 1 where the adjustment of the selected insurance policy parameter comprises a change in an insurance coverage.

A5078

US 7,124,088 B2

11

12

**28.** The system of claim **1** where the adjustment of the selected insurance policy parameter comprises a change of an address.

**29.** The system of claim **1** where the adjustment of the selected insurance policy parameter changes the party insured under the existing insurance policy.

**30.** The system of claim **29** where the party insured comprises a person insured under the existing insurance policy.

**31.** The system of claim **1** where the adjustment of the selected insurance policy parameter comprises changing the selected insurance policy parameter or a party insured under the existing insurance policy.

**32.** The system of claim **1** where the adjustment of the selected insurance policy parameter comprises receiving information about a party to be insured under the existing insurance policy.

**33.** The system of claim **1** where the adjustment of the selected insurance policy parameter adjusts a deductible.

**34.** The system of claim **1** where the existing insurance policy comprises a vehicle insurance policy.

**35.** The system of claim **1** where the publicly accessible distributed network comprises the Internet.

**36.** The system of claim **1** where the personal security code comprises a password.

**37.** The system of claim **36** where the password comprises a unique string of characters that identifies the insurance policyholder.

**38.** The system of claim **1** where the first data is received through a web page.

**39.** The system of claim **1** further comprising a policy quote module coupled to the publicly accessible distributed network to generate an insurance rate quote.

**40.** The system of claim **1** where the information module provides insurance information to the web browser through the publicly accessible distributed network.

**41.** The system of claim **40** where the insurance information comprises on-line forms.

\* \* \* \* \*

A5079

US007124088C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9276th)

# United States Patent
Bauer et al.

(10) **Number:** US 7,124,088 C1
(45) **Certificate Issued:** Sep. 4, 2012

(54) **APPARATUS FOR INTERNET ON-LINE INSURANCE POLICY SERVICE**

(75) Inventors: **Alan R. Bauer**, Mill Valley, CA (US); **Amanda L. Bowman**, Bedford, OH (US); **Richard J. Keyser**, Euclid, OH (US); **Megan N. NcNamara**, Rocky River, OH (US); **Cheryl L. Urminski**, Cleveland Heights, OH (US); **Leslie Youngstrom**, Sacramento, CA (US); **Toby Alfred**, Orange, OH (US)

(73) Assignee: **Progressive Casualty Insurance Company**, Mayfield Village, OH (US)

Reexamination Request:
No. 90/011,612, Mar. 31, 2011

Reexamination Certificate for:
Patent No.: 7,124,088
Issued: Oct. 17, 2006
Appl. No.: 09/364,803
Filed: Jul. 30, 1999

(51) Int. Cl.
*G06Q 40/00* (2006.01)

(52) U.S. Cl. .......................................................... 705/4
(58) Field of Classification Search ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,612, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Jeffrey Carlson

(57) **ABSTRACT**

An Internet on-line insurance policy service system that facilitates real-time automated communication of policy information, adjustment of policy parameters, calculation and communication of resulting policy quotes, and implementation of policy changes, while obviating insurer personnel involvement and supervision of the communication. The system comprises a plurality of software modules relating to on-line real-time communication of existing policy information, testing of a wide range of variations in policy parameters, computing and communicating changes in policy premiums that would result from such variations, communicating desired changes in policy parameters and implementing desired policy changes. Other modules relate to communicaton of claims information and the providing of on-line forms.



A5080

US 7,124,088 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 1-41 is confirmed.

New claims 42-46 are added and determined to be patent-
able.

*42. The system of claim 1 where the insurance policy
adjustment module is further configured to generate in real-
time an insurance policy cost adjustment attributable to the
adjustment of the insurance policyholder's insurance policy
parameter, and where the insurance policy adjustment mod-
ule is also further configured to communicate the insurance
policy cost adjustment in real-time in the customized insur-
ance document sent to the insurance policyholder over the
publicly accessible distributed network.*

**2**

*43. The system of claim 1 where the adjustment of the
insurance policy parameter further comprises an adjustment
to an insurance deductible or policy limit associated with the
existing insurance policy; and*

*where the insurance policy adjustment module is further
configured to generate an insurance policy cost adjust-
ment attributable to the adjustment of the insurance
deductible or policy limit, and where the insurance
policy adjustment module is also further configured to
communicate the insurance policy cost adjustment to
the insurance policyholder over the publicly accessible
distributed network in real-time in the customized
insurance document.*

*44. The system of claim 1 further comprising a claims
information module coupled to the publicly accessible dis-
tributed network and a payment enablement module coupled
to the publicly accessible distributed network.*

*45. The system of claim 1 further comprising a claims
information module coupled to the publicly accessible dis-
tributed network and a policy quotes module coupled to the
publicly accessible distributed network.*

*46. The system of claim 1 further comprising a claims
information module coupled to the publicly accessible dis-
tributed network, a payment enablement module coupled to
the publicly accessible distributed network, and a policy
quotes module coupled to the publicly accessible distributed
network.*

\* \* \* \* \*

**A5081**

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September 2014, I caused the

foregoing brief to be electronically filed using the CM/ECF system, which will

send notification of such filing to all parties of record.

I further certify that pursuant to Fed. R. App. P. 25(a)(2)(D) and 25(c),

Federal Circuit Rule 25(a), and ECF-10(B) of the Court's Administrative Order

Regarding Electronic Case Filing, dated May 17, 2012, I shall cause six paper

copies of the foregoing brief to be filed at the address provided below within five

days of the court's acceptance of the foregoing brief in ECF:

Office of the Clerk
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

September 25, 2014                    Respectfully submitted,

                                     /s/ James R. Sobieraj
                                     James R. Sobieraj
                                     Cynthia A. Homan
                                     James A. Collins
                                     Laura A. Lydigsen
                                     Nicholas A. Restauri
                                     BRINKS GILSON & LIONE
                                     455 N. Cityfront Plaza Drive
                                     Suite 3600
                                     Chicago, Illinois 60611

                                     *Counsel for Appellant,*
                                     *Progressive Casualty Insurance Co.*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 13,029 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).  Microsoft Word 2010 was used to calculate the word count.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

September 25, 2014                              Respectfully submitted,

                                               */s/ James R. Sobieraj*
                                               James R. Sobieraj
                                               Cynthia A. Homan
                                               James A. Collins
                                               Laura A. Lydigsen
                                               Nicholas A. Restauri
                                               BRINKS GILSON & LIONE
                                               455 N. Cityfront Plaza Drive
                                               Suite 3600
                                               Chicago, Illinois 60611

                                               *Counsel for Appellant,*
                                               *Progressive Casualty Insurance Co.*